425 F.2d 665
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MIDTOWN SERVICE CO., Inc. 500 Fifth Avenue Inc., 11 West 42nd Street, Inc., Broadtown Construction Co., Inc., Seycorn Leasing Co., Inc., Atlantic Leasing Co., Inc., Northern Fee Co., Inc., Salmon Management Co., Inc. and West 42nd Street Realty Corp., Respondents.
 No. 393.
 No. 394.
 No. 395.
 Dockets 33743-33745.
 United States Court of Appeals, Second Circuit.
 Argued January 7, 1970.
 Decided February 25, 1970.
 As Modified May 4, 1970.
 Rehearing Denied June 3, 1970.
 
 Sanford H. Fisher, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Herman M. Levy, N. L. R. B., Washington, D. C., on the brief), for petitioner.
 Thomas P. Schnitzler, New York City (Louis Jackson, and R. Bret Mintz, Jackson, Lewis, Schnitzler & Krupman, New York City on the brief), for respondents.
 
 
 1
 Katz & Wolchok, New York City, brief amicus curiae for Local 670, Retail, Wholesale and Dept. Store Union, AFL-CIO.
 
 
 2
 Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge and MANSFIELD, District Judge.*
 
 MANSFIELD, District Judge:
 
 3
 The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151 et seq., seeks enforcement of its order issued against Respondents on June 13, 1968, reported at 171 N.L.R.B. No. 161.
 
 
 4
 Respondents (hereinafter collectively referred to as the "Employer") are a group of affiliated corporations owning or leasing office buildings in New York City. On September 14, 1966, a Board-conducted decertification election was held to determine whether or not the Employer's service and maintenance employees desired to continue to be represented by Local 670, Retail, Wholesale and Department Store Union, AFL-CIO (hereinafter referred to as "Local 670"), which had acted as the exclusive bargaining representative for such employees since its certification by the Board in 1960. The election, which Local 670 lost by a vote of 111-94, was set aside on October 10 for misconduct by the decertification petitioners[1] and because the Employer had failed to file with the Regional Director a list of its employees' names and addresses as required by the Board's recent decision in Excelsior Underwear, 156 N.L.R.B. 1236 (1966). A rerun election, originally scheduled for December 14, 1966, was postponed as a result of the Employer's continued refusal to supply an Excelsior list. More than three years later the election has still not been held, apparently for the reason that the Board has not invoked established judicial procedures for extracting such a list from the Employer.[2]
 
 
 5
 On May 19, 1967, a consolidated complaint was filed charging the Employer with unfair labor practices based upon its efforts to defeat the decertification movement. There followed proceedings before the NLRB which led to the order before us. After taking extensive proof the Trial Examiner found that from the time the Employer had first become aware of the efforts to decertify Local 670 it had vigorously sought to defeat the decertification movement in order to protect and maintain Local 670 as the bargaining representative of its employees. The Employer's efforts in the pre-election period included supervisory solicitation of employees to sign petitions favoring Local 670 and numerous threats by supervisors that employees would lose their jobs if Local 670 lost the election.
 
 
 6
 The Trial Examiner further found that after Local 670 lost the election the Employer continued its campaign to return it and to defeat the efforts of the supporters of the decertification movement. Company supervisors assisted representatives of Local 670 in signing up building employees and themselves solicited employees to sign dues checkoff authorizations for Local 670. One supervisor even collected dues for the union for some time after the election. The threats of loss of jobs if Local 670 should be defeated continued, buttressed by a general tightening up of the employees' work rules. Josephine Massaro, one of the three principal promoters of the decertification movement, was summarily discharged one month after the election. In early 1967 the Employer negotiated a collective agreement with Local 670 that was later formalized into a contract succeeding to the one that had expired before the election of September 14.
 
 
 7
 With the foregoing findings of the Trial Examiner before it, the Board concluded that the Employer, in violation of § 8(a) (1) of the Act, had interfered with, restrained and coerced employees in the exercise of rights guaranteed by the National Labor Relations Act; that it had contributed support to Local 670 in violation of §§ 8(a) (2) and (1) of the Act; and that it had encouraged membership in Local 670 by discrimination in regard to tenure of employment in violation of §§ 8(a) (3) and (1) of the Act.
 
 
 8
 In view of the substantiality of the supporting evidence, the Employer understandably does not contest the Board's finding of § 8(a) (1) violations; its efforts to influence its employees in their choice of a bargaining representative were numerous and flagrant, and were amply supported by the proof before the Trial Examiner. It is equally clear that the Employer's threats of loss of jobs, its reprisals taken against opponents of Local 670, its solicitation — and cooperation in the union's solicitation — of memberships in Local 670, and its collection of dues for the union, constituted violations of § 8(a) (2). The Employer does challenge, however, the Board's conclusions that its negotiation of a successor contract with Local 670 after the decertification election had been set aside constituted a violation of § 8(a) (2) of the Act, and that Josephine Massaro was discriminatorily discharged in violation of § 8(a) (3). Its further objections to certain provisions of the Board's order will be discussed separately below.
 
 
 The Negotiation of a Successor Contract
 
 
 9
 On August 30, 1966, prior to the holding of the decertification election, representatives of the Employer and of Local 670 met to discuss the negotiation of a new collective agreement to replace a three-year contract which had expired on July 31, 1966. No further bargaining sessions were held until January 23 and January 26, 1967, at which time an oral understanding was reached. Although no written agreement was thereupon executed, in the following months certain improvements in the employees' terms and conditions of employment were made by the Employer in accordance with the terms of the oral understanding.
 
 
 10
 On May 12, 1967, Local 670 requested the Employer to execute a stipulation embodying the earlier understanding. The Employer refused, explaining that in view of the results of the September decertification election it had serious doubts about the continuing majority status of the union.[3] On May 29 Local 670 renewed its request. After the union directed its attention to the recent Board decision in Decorel Corp., 163 N. L.R.B. 146 (1967), the Employer executed the requested stipulation, which provided for an extension of the expired contract with its union-security clause until July 31, 1969, with certain improvements and modifications.
 
 
 11
 In arguing that the negotiation of the collective bargaining contract with Local 670 and the grant of benefits pursuant thereto did not violate § 8(a) (2), the Employer places great stress upon the presumption of continued majority status enjoyed by a union which has been duly certified pursuant to a Board-conducted election. Brooks v. NLRB, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1954); NLRB v. Gallaro, 419 F.2d 97 (2d Cir. Dec. 8, 1969); NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589, 592 (5th Cir. 1966); NLRB v. Local 3, IBEW, 362 F.2d 232, 235 (2d Cir. 1966); NLRB v. Whittier Mills Co., 111 F.2d 474, 478 (5th Cir. 1940). It argues that since it had a duty under § 8(a) (5) to bargain with the incumbent union, it should not now be penalized for performance of that duty.
 
 
 12
 The presumption of continued majority status of a certified union, however, is rebuttable, NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589, 592 (5th Cir. 1966); NLRB v. Gallaro, 419 F.2d 97 (2d Cir. Dec. 8, 1969), and where circumstances cast doubt upon such continued representation, the question of whether or not a refusal to bargain constitutes a violation of § 8(a) (5) depends upon whether the Employer has a reasonable basis for doubting in good faith that the union's majority representation continues. Celanese Corp. of America, 95 N.L.R.B. 664, 671 (1951). Here the circumstances found by the Trial Examiner demonstrate not only that a reasonable basis existed for the belief that Local 670 no longer represented a majority of the employees but that the Employer in fact doubted such representation.
 
 
 13
 The very fact that the Employer, even prior to the decertification election, engaged in such flagrant and continued misconduct directed toward maintenance of Local 670 as the employees' bargaining representative betrays the Employer's belief that a real question of representation existed. Otherwise there was little purpose behind the Employer's strenuous efforts in support of Local 670. Such misconduct, standing alone, might well be deemed to have the effect of destroying the presumption in favor of the union's continued majority status. Surely that presumption assumes that the Employer will not engage in activities having the effect of converting a freely-chosen majority representation into a coerced one, which would amount to a usurpation of the employees' right of free choice under the Act. Empire State Sugar Co. v. NLRB, 401 F.2d 559, 562 (2d Cir. 1968). Once the union's majority status is thus tainted, to uphold a contract negotiated with it thereafter would be to reward the Employer for its misconduct.
 
 
 14
 It is unnecessary in the present case, however, to declare that the Employer's misconduct per se dissipated the union's majority status. Here we have much more. Granted that the mere filing of a decertification petition did not require the Employer to assume the existence of a real question of representation, NLRB v. Swift & Co., 294 F.2d 285, 288 (3d Cir. 1961); St. Louis Independent Packing Co. v. NLRB, 291 F.2d 700, 704 (7th Cir. 1961), there followed a decertification election which the union lost by a vote of 111-94. The Employer argues that the Board's decision in Decorel Corp., 163 N.L.R.B. 146 (1967), deprives this election result of evidentiary force as an indication of the desires of its employees, since the election was set aside. In Decorel, as in this case, the issue was what effect should be given the results of a decertification election lost by the incumbent union but later set aside by the Board. It was held that because of the Employer's misconduct in trying to oust the incumbent union, the results could not be taken as a fair reflection of the desires of the employees and the Employer was therefore not relieved of its obligation to negotiate with the incumbent union.
 
 
 15
 Decorel does not, however, stand for the broad proposition that the results of a decertification election, once set aside, cannot be considered in any way probative of a union's majority status. Since the employer there had engaged in unfair labor practices calculated to influence employees against the incumbent union, and a subsequent decertification election resulted in a vote against that union, there was no way of knowing what uncoerced employee sentiment really was. Here, however, the Employer engaged in concerted efforts in favor of the incumbent union, Local 670, and in spite of those efforts Local 670 lost the election. All else being equal, this would indicate that Local 670 had indeed lost its majority. Absent the Employer's unfair labor practices the union's margin of defeat would presumably have been even larger, and the presumption of continued majority status convincingly rebutted.
 
 
 16
 The Employer, however, urges that since the election was set aside not only because of unfair labor practices on the part of the employer, as in Decorel but also because of misconduct by the decertification petitioners in distributing a marked facsimile ballot, we cannot logically draw any conclusions from the result as to what uncoerced employee sentiment might have been. While we cannot be absolutely certain that Local 670 would not have won the election in the absence of the misconduct by the decertification petitioners, we are persuaded that the decertification vote, when considered in the light of the Employer's earlier unlawful activities aimed at coercing its employees to support Local 670, has strong probative force in demonstrating the existence of a reasonable basis for good faith doubt as to that union's continued majority representation status. Indeed, the Employer had just such a doubt, which was contemporaneously expressed in no uncertain terms. A letter by its attorneys in reply to the union's May 12 request for execution of the contract stipulation, contains the following:
 
 
 17
 "Our clients feel that, in view of the results of the decertification election, a serious question exists as to the majority status of your client's union. * * *"
 
 
 18
 In such circumstances it was the Employer's duty to refrain from bargaining with the union "unless and until the question concerning representation ha[d] been settled by the Board." Shea Chemical Corp., 121 N.L.R.B. 1027, 1029 (1958); Mid-West Piping & Supply Co., 63 N.L.R.B. 1060 (1945), cited with approval in NLRB v. National Container Corp., 211 F.2d 525, 536 (2d Cir. 1954). Instead, the Employer continued its campaign against the opponents of Local 670, negotiated and signed a contract with that union, and effectively prevented the holding of a rerun election by its continued refusal to supply the Excelsior list required by the Board. It would be paradoxical to allow an employer to benefit from a presumption of continued majority status when it is the employer's own refusal to furnish a list of employees' names and addresses that has prevented the testing of the presumption through a valid decertification election. It would be even worse to allow an employer to bargain in reliance upon the same presumption when the "majority" to which it refers, if it exists at all, is in part at least a coerced majority of the employer's own creation. The presumption of continued majority status normally enjoyed by an incumbent union may not be invoked by an employer who makes flagrant attempts to create and maintain the very majority upon which it relies.
 
 
 19
 Since the Employer had a duty to refrain from bargaining with Local 670 until the representation question raised by the decertification election had been settled, the negotiation and execution of a successor contract in early 1967 must be held to have contributed support to that union in violation of §§ 8(a) (2) and (1) of the Act.
 
 
 The Discharge of Josephine Massaro
 
 
 20
 At the time she was discharged on October 13, 1966, Josephine Massaro had been working for the Employer, with the exception of a 15-month period during World War II, for 24 years. She was a cosigner of the decertification petition, and a leading participant in the campaign against Local 670, both prior and subsequent to the election of September 14. She was fired for violation of an Employer rule restricting employees to their assigned floors during working hours.
 
 
 21
 It is not contested that Massaro was absent from her assigned floor on two of the three nights preceding her discharge. However, "an employer having a right to discharge employees for * * * unprotected activity may not discharge them for a discriminatory reason without violating Section 8(a) (3) of the Act," NLRB v. Coal Creek Coal Co., 204 F.2d 579, 583 (10th Cir. 1953), even if the improper motive is only partially responsible for the action. NLRB v. Local 282, Int'l Brotherhood of Teamsters, 412 F.2d 334 (2d Cir. 1969). Here the rule restricting employees to their assigned floors, although in existence for many years, had not been strictly enforced until after the decertification movement began. Massaro was discharged without warning, three days after the Regional Director had ordered the holding of a second decertification election, and one day after she had been observed visiting, off her floor, with Anna Mitchell, her cosigner on the decertification petition.
 
 
 22
 The normal practice in cases where cleaning women were found off their floors during working hours was to remind them of the existence of the rule and to give them a personal warning. While there was evidence indicating that at least two other cleaning women had been off their floors on the night of October 12, apparently Massaro was the only one discharged. As the Trial Examiner observed, "Ordinarily one would expect a word of warning to an employee of over 23 years service before summarily discharging her." See Brewers & Maltsters Local Union No. 6 v. NLRB, 301 F.2d 216, 223-224 (8th Cir. 1962); NLRB v. Dan River Mills Inc., 274 F.2d 381, 384 (5th Cir. 1960).
 
 
 23
 In the context of the Employer's continuing efforts to support Local 670 and to undermine the decertification movement, there was substantial evidence warranting the Board's conclusion that Massaro would not have been discharged but for her anti-union activity. Her termination therefore violated §§ 8(a) (3) and (1) of the Act.
 
 
 The Board's Order
 
 
 24
 The Board's order requires the Employer to cease and desist from engaging in the unfair labor practices found; to withdraw and withhold recognition from Local 670 until its majority status has been demonstrated by a Board-conducted election; to cease and desist from giving effect to any contract entered into with Local 670 (although no wage, hour or seniority provision, or any other "substantive feature" of the relationship between the Employer and its employees established pursuant to the contract is to be abandoned); to reimburse four employees solicited by supervisors to sign Local 670 membership cards and dues checkoff authorizations for any fees, dues or other sums paid to the union; to reimburse all employees who were coerced into becoming members of Local 670 after the unlawful renewal of the union-security agreement effective July 31, 1966, for moneys paid to the union; to offer Josephine Massaro reinstatement and back-pay; and to post the customary notices.
 
 
 25
 The Employer attacks that part of the order directing reimbursement of dues to those employees who were coerced into becoming members of Local 670 after renewal of the union-security agreement, arguing that there is no evidence that any employees were in fact coerced into joining the union by the renewal of the union-security agreement, and that such evidence has been dispensed with in enforcing dues reimbursement remedies only in cases where the unions were illegal ab initio or company-dominated.
 
 
 26
 The simple answer to these contentions is that a finding of coercion has not been dispensed with in this case. The Board's order specifies that reimbursement shall be paid to
 
 
 27
 "all those employees who became members of Local 670 after the unlawful renewal of the union-security agreement effective July 31, 1966, for initiation fees, dues, assessments, or other moneys paid by them to Local 670, together with interest at the rate of 6 percent per annum, as set forth in the section of the Board's Decision and Order entitled `The Amended Remedy.'"
 
 
 28
 The "Amended Remedy" section of the Board's decision states:
 
 
 29
 "We shall order such reimbursement as well for all other employees who were coerced into joining Local 670 by the Respondent's renewal * * * of the union-security agreement." (Emphasis added)
 
 
 30
 Thus the decision and order clearly contemplate further proceedings at which testimony may be taken on the issue of coercion, and reimbursement is to be made only to those who can demonstrate that they would not have joined Local 670 in the absence of the unlawful union-security agreement.
 
 
 31
 Furthermore, while no proof was adduced that the renewal of the union-security agreement in and of itself coerced any employees into joining the union and paying initiation fees and dues to it, we are not dealing with a case where an employer mistakenly but in good faith recognized a union's claim to majority status, without any employee objection, as was the situation in Intalco Aluminum Corp. v. NLRB, 417 F.2d 36 (9th Cir. 1969), the authority principally relied upon by the employer. Here the Employer has been guilty of massive unfair labor practices in support of the union with whom the contract was negotiated. Though not Employer-dominated, Local 670 was extensively Employer-supported. Furthermore, there was evidence of actual coercion; the Employer does not challenge the specific finding that four employees signed membership and dues checkoff authorization cards at the instance of Employer supervisors, or contest the propriety of reimbursement to such employees. The results of the decertification election supply evidence of extensive employee dissatisfaction with Local 670, and testimony that certain employees stopped paying dues to the union in the months following the expiration of the prior contract, while it tends to negate any finding of actual coercion, also demonstrates that employees did not want the union.
 
 
 32
 We therefore grant full enforcement of the Board's order. At the same time we cannot allow the three-year delay in obtaining a second decertification election to pass without comment. A primary objective of the order before us is to insure the employees a free and unfettered choice of bargaining representatives, as required by the Act, by enforcing remedies against unlawful activities on the part of the Employer designed to perpetuate Local 670's incumbent status. Nevertheless because of the failure to have a prompt rerun decertification election the employees have for the past three years been denied the opportunity to proceed with the selection of a properly certified bargaining representative.
 
 
 33
 We recognize that under its established policy the Board, upon the union's filing of unfair labor practice charges in 1967, would ordinarily refuse to conduct a representation election unless the union waived reliance upon the charges as a basis for invalidating the election or special circumstances justified the holding of the election. Furr's Inc. v. NLRB, 350 F.2d 84, 85 (10th Cir. 1965). If ever there were special circumstances warranting the holding of the election, they existed here. If, as the Board states (Petition for Modification, p. 3) the charges were filed by the union, adherence to the policy in the present case would permit the union, as the beneficiary of the Employer's misconduct, merely by filing charges to achieve an indefinite stalemate designed to perpetuate the union in power. If, on the other hand, the charges were filed by others claiming improper conduct on the part of the Employer, we believe that the risk of another election (which might be required if the union prevailed but the charges against the Employer were later upheld) is preferable to a three-year delay.
 
 
 34
 Nor can we accept as a valid excuse the Board's contention that the delay should be laid entirely at the door of the Employer because of its persistent refusal to provide an Excelsior list, without which the election cannot properly be held. Inexcusable as such tactics on the Employer's part may be, no reason appears why the Board did not compel production of the list by subpoena, as it has done in a number of similar cases. See, e. g., NLRB v. Wyman-Gordon Co., 270 F.Supp. 280 (D.Mass.1967). Although the enforceability of such subpoenas was not conclusively established until the Supreme Court's April, 1969 decision in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), the power had been recognized by the great majority of the lower courts. 270 F. Supp. at 283, 394 U.S. at 762, n. 1, 89 S.Ct. 1426. If the Board insists on such lists as a necessary condition of valid decertification elections, it has an obligation to make every effort to see that they are promptly supplied. When the Board simply chooses not to press for direct relief, and meanwhile delays its own order and application for enforcement, it defeats the statutory protections which it purports to administer.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The Regional Director found, in his Supplemental Decision and Direction of Second Election, that the decertification petitioners had interfered with the election by distributing to the employees an election handbill containing a facsimile of the official Board ballot with an "X" marked in the "No" box
 
 
 [2]
 See discussion under "The Board's Order,"infra.
 
 
 [3]
 The text of the letter from the Employer's attorneys read as follows:
 "We are in receipt of your letter of May 12, 1967 requesting execution of a contract. Our clients feel that, in view of the results of the decertification election, a serious question exists as to the majority status of your client's union, Local 670, RWDSU.
 "Under present NLRB law, we feel that the best evidence of majority representation you can tender under the present circumstances is authorization of your client's union by a majority of employees. The Board has given its approval to such procedure in similar circumstances. We therefore decline your request."