**SUBURBAN TRANSIT CORP.** and **H.A.M.L. Corporation,**
Petitioners,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent,
Highway and Local Motor Freight Drivers Local No. 701, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor.

**UNITED TRANSPORTATION UNION, LODGE NO. 1589,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

Nos. 73-1377, 73-1442.

United States Court of Appeals, Third Circuit.

Argued Feb. 12, 1974.

Decided May 23, 1974.

Alfred J. Hill, Wilentz, Goldman & Spitzer, Perth Amboy, N. J., for petitioners in No. 73–1377.

Robert M. Saltzstein and Jeffrey S. Dubin, Mirkin, Barre, Saltzstein & Gordon, P.C., Great Neck, N. Y., for petitioner in No. 73–1442.

David Friedland, Jersey City, N. J., for intervenor in No. 73–1377.

Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, William H. DuRoss, III, John M. Flynn, Attys., N. L. R. B., for respondent.

## OPINION OF THE COURT

Before VAN DUSEN and ADAMS, Circuit Judges, and HUYETT, District Judge.

VAN DUSEN, Circuit Judge.

This case is before this court upon the petitions of Suburban Transit Corporation ("Suburban"), H.A.M.L. Corporation ("H.A.M.L."), and United Transportation Union, Lodge No. 1589 ("UTU") to review and set aside a decision and order of the National Labor Relations Board (hereinafter "NLRB" or "Board") issued against Suburban and H.A.M.L. on May 4, 1973, and reported at 203 N.L.R.B. No. 69. The Board has cross-applied for enforcement of that order. This court has jurisdiction pursuant to § 10(e) and (f) of the National Labor Relations Act, as amended (hereinafter "Act"). 29 U.S.C. § 160(e) and (f).

The unfair labor practice charges, which resulted in the Board's

order in this case, were filed by the Highway and Local Motor Freight Drivers, Local No. 701, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters") in October and November of 1971. As amended and consolidated,[1] the complaint filed by the Board under Section 10(b) of the Act, 29 U.S.C. § 160(b), alleged that Suburban violated (A) §§ 8(a)(1) and (2) of the Act by executing a new collective bargaining agreement with UTU while a question concerning representation existed, (B) §§ 8(a)(1) and (3) by virtue of the fact that said contract contained a union-security provision, (C) § 8(a)(1) by making threats to certain striking employees, and (D) §§ 8(a)(1) and (3) by discharging those employees. The complaint also alleged that H.A.M.L. violated (A) §§ 8(a)(1) and (2) by executing a contract with UTU at a time when UTU did not represent an uncoerced majority of H.A.M.L.'s employees and by assisting UTU in its organizing drive, (B) §§ 8(a)(1) and (3) by the inclusion of a union-security provision in said contract, and (C) § 8(a)(1) by acts of surveillance of and assistance to union activities.[2]

On the basis of this complaint, the Board filed a petition for an injunction under § 10(j) of the Act on January 24, 1972. Thereafter, extensive hearings were conducted by the Administrative Law Judge, the transcript of which was forwarded to the district court and made a part of the injunction proceeding by agreement of the parties. Following oral argument and submission of briefs, the district court on July 26, 1972, rendered an opinion and order denying the Board's application for injunctive relief. See Balicer v. Suburban Transit Corp., unpublished opinion of 7/28/72 (Civil No. 158–72, D. N.J.).[3] The Administrative Law Judge issued his decision on November 27, 1972, in which he found that Suburban and H.A.M.L. violated §§ 8(a)(1), (2) and (3) of the · Act as charged in the complaint, and he incorporated a proposed order. On May 4, 1973, a three-member panel of the Board affirmed the findings and conclusions of the Administrative Law Judge and adopted his recommended order.

### I. *Charges Against Suburban*

UTU has represented Suburban's employees for approximately 30 years.[4] In July 1971, UTU requested that bargain-

---

1. Before the Board Suburban and H.A.M.L. attacked the order consolidating these cases, contending that the two companies do not constitute a single employer within the meaning of § 2(2) of the Act. However, the Board found that they did constitute a single employer and Suburban and H.A.M.L. now challenge that finding. It is well settled that this question is for the Board to determine and where businesses are under common ownership, control and management, they may be considered as a single employer. See NLRB v. Stowe Spinning Co., 336 U.S. 226, 227 n. 2, 69 S.Ct. 541, 93 L.Ed. 638 (1949); NLRB v. City Yellow Cab Co., 344 F.2d 575, 577–578 (6th Cir. 1965); NLRB v. National Shoes, Inc., 208 F.2d 688, 691 (2d Cir. 1953). The record in this case reveals that Suburban's sole owner is Morris Lipschitz; its officers are Morris Lipschitz and his two sons-in-law, Lee Jacobs and Sidney Kuchin; and its directors are Morris Lipschitz, his wife, Lillian Lipschitz, and his nephew Herman Lipschitz. The owners and sole officers and directors of H.A.M.L. are Jacobs, Kuchin, and Herman Lipschitz. We

therefore hold that there is substantial evidence to support the Board's finding of a single employer.

2. "8. (a) It shall be an unfair labor practice for an employer—

   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: . . .

   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . . ."

3. We note that in this opinion the district court found that there was not even "reasonable cause" to believe that Suburban and H.A.M.L. violated §§ 8(a)(1), (2), and (3).

4. UTU was formerly known as the Brotherhood of Railway Trainmen, Lodge No. 993. Suburban had a collective bargaining relationship with the Brotherhood starting in

ing for the terms of a new contract commence as the then current agreement was due to expire on September 14, 1971. In late August, Suburban employee Daniel Rava was elected chairman of UTU's bargaining committee, which also included employees Peterson and Bowman. Although not officially members of the committee, Gerald McPhillips, a UTU international representative, and Austin Zechman, a UTU vice president, assisted the committee in its deliberations. Suburban was represented by Morris Lipschitz, officer, director and sole owner of Suburban, Lee Jacobs and Sidney Kuchin, the two other Suburban officers, and Ronnie Kohn, Suburban's office manager.

After a series of bargaining sessions, the parties reached accord on September 13 on a three-year agreement. On September 14 a ratification meeting was held at which the employees decisively rejected the proposed contract by a vote of 49 to 3, apparently because of its three-year term. Following this meeting, the UTU committeemen agreed to bargain for a shorter, two-year contract term. However, at the next bargaining session on September 24, Suburban insisted upon a three-year contract, but offered to increase its initial wage offer. The subsequent ratification meeting, attended by about 30 Suburban employees, broke up in chaos when the term of the contract was announced and no ratification vote was taken. After the meeting, McPhillips met with Rava and Peterson, and they all agreed that they had not had a fair opportunity to present the package to the men and that they should meet with Suburban again.

As early as July 1971, Rava and, at some time during that summer, several other employees, had become interested in the possibility of changing union representation from UTU to the Teamsters. Between July and September, Rava called the Teamsters on several occasions to explore avenues of having the Teamsters represent the Suburban employees. In early September, he and employee Manga met with Martin McDermott, a Teamsters international representative, at the Teamsters' premises. McDermott agreed to check to see if there was a "no raid pact" with the UTU but warned that the Teamsters could be of no help until the contract expired. Thereafter, Rava called the Teamsters several times and was told by McDermott that there was not a "no raid pact" between Teamsters and UTU.

On the morning of September 15, Rava requested that Peterson meet him at the Teamsters' premises, where they discussed with McDermott ways in which a change in union representation could be effected. During this meeting, McDermott gave Rava a decertification petition and some Teamsters' membership cards, which Rava placed in the trunk of his car. Later that day, Peterson informed McPhillips of the meeting with McDermott. McPhillips then advised UTU vice-president Kenneth Moore of Rava's contacts with the Teamsters, and Moore requested that McPhillips obtain further information before having Rava removed from his union office.

On September 26, Rava gave the decertification petition and Teamsters' authorization cards to Manga, who proceeded to solicit signatures. After obtaining signatures of more than 30% of Suburban's employees, Manga filed the petition for decertifying UTU on September 29, and the Teamsters filed a representation petition the same day. Suburban received the petitions on October 2.

On September 28, Suburban officials and the UTU bargaining committee met again and agreed that it would be useless to hold another membership meeting. The mediator suggested that a pe-

1942. The last contract between the two parties ran from September 15, 1968, to September 14, 1971. At some time during the term of that contract, UTU became the successor to the Brotherhood and assumed and administered the aforesaid collective bargaining agreement.

tition be drawn up and that members of the committee speak to each employee, and if a majority signed the petition, then the committee could sign the contract. Rava opposed the petition and suggested instead a mail ballot, which was finally agreed upon. That night, however, while Peterson was in a meeting with Zechman at the latter's home, Moore called Zechman and told him that Rava was collaborating with the Teamsters and that he was taking steps to have Rava removed as chairman of the wage committee. Zechman began to suspect that Rava's suggestion of the mail ballot was designed to cause further delay and, therefore, he and Peterson decided to proceed with a petition.

The contract ratification petition was drawn up and circulated on October 1 by Peterson and another UTU official, Tom Alexander, and was returned to Zechman on October 2 with 51 signatures (out of the 61 employees constituting the unit of drivers). McPhillips contacted Suburban president Lipschitz and told him that the committee believed they had a majority and were prepared to sign a renewal agreement. The signatures on the petition were checked against the payroll forms and were found to be valid. Lipschitz agreed to sign the contract when he returned from a trip to California, and on October 14 the contract was executed.

On the evening of October 26, a meeting was held at the Teamsters' hall and a group of Suburban employees voted to strike, apparently to protest both the discharge of two workers because of an unrelated accident and the execution of the contract with UTU. The next day, and for a few days thereafter, a number of Suburban employees went out on strike and began picketing the company's premises, with signs reading "Employees of Suburban Transit on Strike Unfair Labor Practices Local Teamsters Union No. 701." The number of employees who picketed is disputed, estimates ranging from 25 to 46. At most only 17 employees worked on the first day of the strike. On October 29, Suburban wrote 34 letters to striking employees, stating that they would be suspended if they did not report for work on November 2. On November 1, Suburban obtained a temporary restraining order from the Superior Court of New Jersey. While most of the employees returned to work on November 2, 19 did not. Following an investigation conducted by Suburban, all but two of the 19 strikers were discharged.

The Board's conclusion that Suburban violated §§ 8(a)(1), (2), and (3) of the Act was based primarily on its finding that the decertification petition filed by Manga and the representation petition filed by the Teamsters (supported by authorization cards) raised a real question concerning representation and that, therefore, Suburban's execution of a new contract with UTU, containing a union security provision, when Suburban had knowledge of those petitions, was an unfair labor practice under the doctrine of Midwest Piping & Supply Co., 63 N.L.R.B. 1060 (1945).[5] The Board recognized that this finding conflicts with our decision in NLRB v. Swift & Co., 294 F.2d 285 (3d Cir. 1961), where this court held that the mere filing of a representation petition by a competing union does not create a real question of representation so as to prevent an employer from entering into an agreement with the previously certified union, but the Board felt constrained to follow its own law on

5. In its findings of fact, the Board related Rava's undisputed testimony that Morris Lipschitz told him that he should work with Peterson and Zechman to get the UTU petition signed, that if 80 or 90 per cent. of the employees signed it, "this would knock the Teamster petition right out of the box," and that if Rava did help, he "would be in with the company one thousand per cent." However, the Board did not rely on that testimony and at no point in its discussion of Suburban's unfair labor practices did it allude to the possibility that the alleged statement by Lipschitz constituted unlawful employer interference in the employees' selection of a bargaining agent.

this point. We, in turn, are constrained to follow *Swift* and, therefore, hold that the Board's determination that a real question of representation existed at the time of the renewal agreement between Suburban and UTU is not supported by substantial evidence. *See also* NLRB v. Peter Paul, Inc., 467 F.2d 700, 702 (9th Cir. 1972); NLRB v. Midtown Service Co., 425 F.2d 665, 669 (2d Cir. 1970); NLRB v. North Electric Co., 296 F.2d 137, 139–140 (6th Cir. 1961); St. Louis Independent Packing Co. v. NLRB, 291 F.2d 700, 704 (7th Cir. 1961).[6]

As to the discharge of the 19 striking employees, the Board's finding of a violation of §§ 8(a)(1) and (3) of the Act was based upon the premise that the strike was protected activity, despite the possible applicability of a no-strike clause in the bargaining agreement, because the Board found it was called, at least in part, to protest an unfair labor practice—i. e., the execution of the new agreement between Suburban and UTU. Since we have held that the evidence does not support the Board's finding

that this agreement constituted an unfair labor practice, its conclusion that the discharge of the strikers violated §§ 8(a)(1) and (3) must also be set aside and the case must be remanded to the Board for a determination as to whether the strike was protected activity in light of Article 13 of the bargaining agreement.[7] *Cf.* Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

## II. *Charges Against H.A.M.L.*

H.A.M.L. began operations in 1968, and until November 1971, its employees were not represented by a union. On November 1, H.A.M.L. employee Langdon contacted the Teamsters' representative McDermott to discuss organizing H.A.M.L. employees. On the evening of November 2, H.A.M.L. employees Coudray, Rayhon and Langdon met with McDermott and Rava, obtained Teamsters' authorization cards from McDermott, and began soliciting signatures the following morning, November 3.

---

6. Because of our holding on this issue, it is unnecessary for us to review the Board's conclusion that Rava's dual role as chief negotiator for UTU and collaborator in the Teamsters' organizing effort was of no legal significance. Nevertheless, we wish to record our strong disapproval of the ethics of such activities by Rava while an official of the UTU, involving, as they appear to have done, the type of conflict of interest that makes it highly improbable that a union representative could fully carry out his responsibilities to his union and to his fellow employees. *Cf.* § 501(a) of the Landrum-Griffin Act, 29 U.S.C. § 501(a):

"The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization . . . to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization . . . ."

See also Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), where the Supreme Court stated: "The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents."

7. Article 13 covers the grievance procedure, and it is noted that subparagraph F contains this provision:

"F. Recourse to outside tribunals will not be made by either party until the Grand Lodge of the Union has been advised and given a reasonable opportunity to intervene and dispose of or adjust the situation as the case may be. This, with the understanding that there shall be no authorized strike during such period the dispute is pending under the discussion with either the local lodge or the Grand Lodge."

In its preamble, the agreement also contains this language:

"The purpose of this agreement is to create a definite understanding between Suburban and the Union regarding rates of pay and working conditions and to establish a plan for the prompt adjustment of grievances and all other disputes arising between Suburban and the Union."

Suburban's former dispatcher, Harold Bien, testified that at 7:30 a. m. on November 3, H.A.M.L.'s manager, Patrick Kilcoyne, called on the telephone and told him that the Teamsters were organizing H.A.M.L.'s employees. Bien then told Zechman, who was present with Bien during the telephone conversation, what Kilcoyne had said, and Zechman allegedly replied, "[W]e'll have to go down there and organize them." Zechman then dictated UTU authorization cards and proceeded to Suburban's office, where he duplicated them on Suburban office equipment. Shortly thereafter, he recruited H.A.M.L. employees Lobmayer, Alexander and Thomas to assist in the UTU campaign and began soliciting signatures in H.A.M.L.'s garage.

Bien also testified that at about 11:30 that morning, he called Jack Flanagan, H.A.M.L.'s dispatcher, to request that drivers be made available for the New York City runs. According to Bien, Flanagan replied: "I am going to have to cut you a couple short. We are down here getting people signing cards." Furthermore, H.A.M.L. employee Schorr testified that when he returned to the H.A.M.L. garage following his afternoon run, Flanagan asked him to see someone in the drivers' room, and that when he went there, Lobmayer solicited his signature for a UTU authorization card.

Later that afternoon, Lobmayer and the other UTU organizers determined they had a majority of employees signed up for UTU, having 40 signed authorization cards out of approximately 50 to 55 employees. They then notified Zechman, who in turn called H.A.M.L. vice president Kuchin and requested ·recognition for UTU. At about 6 p. m., Kuchin called Kilcoyne and told him to be available. At about 7:30 p. m., Kuchin called the home of Suburban's manager, Kohn, where a party was in progress, and told Kilcoyne to come to Suburban's offices.

Kilcoyne and his wife, who were among the guests, left the party with Kohn and went to Suburban's offices. Awaiting them there were Zechman, Kuchin and H.A.M.L. president Jacobs, as well as the newly appointed UTU bargaining committee of Alexander, Bascocky, Lobmayer, and Fayda. Before their arrival, Kuchin had checked the UTU authorization cards and had identified 35 of the signatures. Having determined that UTU represented a majority of the employees, Kuchin extended recognition to it.

At the beginning of the meeting, Zechman stated that "it was important to get the contract signed, negotiated and signed so we could get it in before the Teamsters, certainly." Thereafter, using the October 14 Suburban-UTU contract as a model or guide, the parties negotiated between 8:00 p. m. and 1:30 a. m. As each portion of the contract was agreed upon, Mrs. Kilcoyne typed that part. Finally, at the conclusion of the session, the contract was signed by the H.A.M.L. officers and then was taken to a motel where UTU vice-president Moore was staying. After a brief discussion, Moore executed the contract for UTU. At work later that morning, Bien asked Kilcoyne how everything had gone in regard to the contract and Kilcoyne replied, "All signed, sealed and delivered."

■ On the basis of the foregoing facts, the Board concluded that H.A.M. L. violated § 8(a)(1), (2), and (3) of the Act by unlawfully assisting UTU in organizing its employees and then executing and maintaining a contract with UTU containing a union security provision. Although we accept, as supported by the evidence, the Board's decision to credit the testimony of Bien where contradicted by that of Zechman and Flanagan,[8] and its finding that Flana-

---

8. Zechman denied having any conversation with Bien on the morning of November 3 concerning the Teamsters' organizational drive or Zechman's intention to go down to H.A.M.L. to organize on behalf of UTU.

Flanagan testified that although he did call Bien on November 3 (as he normally did several times a day), he merely told Bien of rumors that one of the unions was signing up men. H.A.M.L. argues that the Board

gan is a supervisor,[9] we agree with H. A.M.L.'s contention that the facts found by the Board fail to establish that H.A.M.L. gave unlawful support or assistance to the UTU organizing drive.

■■ We are mindful that "where, as here, we are in agreement that substantial evidence supports the Board's findings, our scope of review is limited to determining whether the Board's factual inferences are so irrational they cannot stand, and whether, if they stand, they justify the Board's order." Department Store Food Corp. of Pennsylvania v. NLRB, 415 F.2d 74, 77 (3d Cir. 1969). Nevertheless, this contention merits close examination because the Board conceded that "the evidence of direct assistance in obtaining signatures on the mimeographed UTU 'authorizations' is not particularly strong," and therefore could conclude only that H.A.M.L. "gave at least tacit approval to and benevolent observation of, the UTU organizers at HAML's garage". The law is clear, however, that cooperation between an employer and a union does not violate but rather accords with the policy of the Act. An unfair labor practice occurs only when the employer's acts of assistance for a union interfere with the right of the employees fairly to choose their representative. And as one court has observed, "the line between 'close cooperation' and 'interference with the freedom of choice of the employees' is a delicate one and often difficult to maintain, particularly where rival unions are involved." NLRB v. Hunter Outdoor Products, Inc., 440 F.2d 876, 880 (1st Cir. 1971).

■ In its decision, the Board placed heavy emphasis on the haste with which H.A.M.L. recognized UTU as the representative of its employees and concluded a contract with it. In light of H.A.M.L.'s knowledge of the Teamsters' drive,[10] the Board adopted the opinion and, therefore, the reasoning of the Administrative Law Judge that such haste constituted an attempt by H.A.M.L. to favor UTU, and there is language in that opinion suggesting that this fact alone established an unlawful interference with the right of the employees to choose their own representative.[11] We

---

should not have believed the contrary testimony of Bien, since he was biased against H.A.M.L., having been summarily dismissed from his job as dispatcher and was financially obligated to the Teamsters and Rava, having received an interest-free loan from them at about the same time he decided to testify for the Teamsters.

While it thus appears that there may be reason to doubt Bien's credibility, "it is not our task to resolve questions of credibility of those who testify at the Board hearings." NLRB v. Local 420, Plumbers, 239 F.2d 327, 328 (3d Cir. 1956). After a careful review of the record, we conclude not to disregard the reasoned evaluation by the Administrative Law Judge of the credibility of the various witnesses.

9. See p. 89, *infra.*

10. There seems to be substantial evidence in the record to support the Board's finding that H.A.M.L. was aware of the Teamsters' organizing effort. H.A.M.L. appears correct that the Board erred in finding that Zechman told *everyone* present at the negotiating session that it was important to get the contract signed to beat out the Teamsters; Zechman's testimony was that he made that statement not only to Fayda but to the "entire committee," that is, the UTU bargaining committee, not H.A.M.L.'s representatives (898a—N.T. 1484). However, as we observed above, the Board could credit Bien's testimony concerning his conversation with Kilcoyne about the Teamsters' drive on the morning of November 3, and could reasonably infer from H.A.M.L.'s haste in recognizing UTU and executing a contract with it that H.A.M.L. knew of the Teamsters' effort and was trying to thwart it. On the other hand, we do not know whether the Board would have made this finding if it had understood correctly Zechman's testimony.

11. "The scenario of that night, [November 3] almost without more, indicates that HAML was exerting every effort to keep Teamsters from becoming the employees' bargaining representative [29a]

"This is not a straight Midwest Piping case, for the contract was executed before the Teamsters petition was filed, without any claim to represent the employees having been made by the Teamsters. But the law does not permit an employer, in circumstances such as these, to recognize one of two competing unions when the recognition is designed to keep

do not believe that by itself it is an unfair labor practice for an employer to grant quick recognition to a union and to negotiate a hasty contract where that union represents an uncoerced majority of the employees,[12] even if the employer is motivated by the desire to freeze out a rival union. The issue before us is not the employer's state of mind but the effect of its actions on the rights of the employees. *Cf.* International Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).[13] "So long as the acts of cooperation do not interfere with the freedom of choice of the employees, there is no violation of the Act." NLRB v. Keller Ladders Southern, Inc., 405 F.2d 663, 667 (5th Cir. 1968). Where a union has achieved the support of a majority of the employees without coercion or unlawful assistance on the part of the employer, its recognition by the employer and the negotiation and execution of a collective bargaining agreement are precisely the sort of cooperation that it is the policy of the Act to foster.[14] Although we reject the Board's suggestion that H.A.M.L.'s haste in recognizing UTU and negotiating a contract with it, without more, would violate the Act, the Board could reasonably infer from such haste that H.A.M.L. preferred to have its employees represented by UTU rather than the Teamsters, and could properly evaluate the other actions of the em-

---

the other union from obtaining representation rights. UTU's role in the affair was not, of course, illegal. As Zechman said, UTU wanted a contract signed as quickly as possible for the express purpose of keeping the Teamsters from filing a petition. If UTU had won a legitimate race to achieve a majority among HAML's employees, with the Teamsters never getting off the ground, then the race would really be to the swift (no pun intended). But the blatant haste by HAML in cooperating with UTU's efforts to freeze out the Teamsters is just the kind of assistance the law prohibits." [31a–32a]

12. In the context of the present argument, UTU may be treated as representing an uncoerced majority of H.A.M.L.'s employees. Although the Board noted in its decision that between six and ten employees signed UTU authorization cards after having already signed Teamsters cards, it did not find that UTU did not in fact represent a majority of H.A.M.L.'s employees. The Board's objection to UTU's claim of majority status was that UTU had received unlawful assistance from H.A.M.L. in obtaining a majority of signatures. It now points out in its brief that several employees testified that when they were approached by Lobmayer and told him that they had signed Teamsters cards earlier that day, he represented that the UTU cards were just for an election. H.A.M.L., on the other hand, contends that it is incredible that those employees could have misunderstood what the UTU cards meant. As noted above, it is not this court's task to decide issues of credibility. Since the Board made no finding on this issue, we have no reason to assume that those signatures were obtained as a result of fraud or misrepresentation on the part of Lobmayer.

13. The Supreme Court held in I.L.G.W.U. v. NLRB, *supra*, that an employer who recognizes a minority union commits an unfair labor practice notwithstanding a good faith belief on his part that it has majority support. The Court stated there, "We find nothing in the statutory language prescribing *scienter* as an element of the unfair labor practices here involved." *Id.* at 739. Following this decision, two circuit courts have held that an employer commits an unfair labor practice if he recognizes a union which his employees have been coerced to support, even if he has no knowledge of that coercion. NLRB v. Hunter Outdoor Products, Inc., *supra* at 879; NLRB v. Jan Power, Inc., 421 F.2d 1058, 1063 (9th Cir. 1970).

14. In its decision, the Board relied on NLRB v. Hunter Outdoor Products, Inc., *supra* at 880, where the First Circuit said:

"Particularly where an employer is aware of organizing efforts by a rival union, it acts at its peril in according hasty recognition when one union claims majority support . . . . The most prudent course for Hunter [the employer] under the circumstances would have been to petition for a Board-conducted election pursuant to § 9(c) of the Act."

The situation in *Hunter*, however, is distinguishable in that there the union claiming majority status had used coercive tactics to obtain employee signatures on its authorization cards and the company had used coercive tactics in helping that union maintain its majority support. Thus, the above-quoted excerpts from *Hunter* must be read to mean that an employer acts at his peril when he accords recognition to a union which turns out not to represent an uncoerced majority of the employees. This is not the case here. See note 12, *supra*.

ployer in the light of that preference in determining whether unlawful assistance had been given to the preferred union. See NLRB v. Keller Ladders Southern, Inc., *supra* at 667.

Turning to the remaining evidence, we note that all but one of the actions attributed to H.A.M.L. provide only weak support for the Board's finding of unlawful assistance. Kilcoyne's telephone call to Bien on the morning of November 3 indicates that H.A.M.L. had knowledge of the Teamsters' organizing campaign, but can hardly be interpreted as an attempt to encourage a counterdrive by UTU, especially since Zechman's learning of what was said appears to have been fortuitous. Of greater weight is the fact that Zechman duplicated the UTU authorization cards at Suburban's office and on Suburban's equipment; however, the inference that the management of Suburban "permitted" Zechman to do this is weakened by the absence of any evidence that it ever knew what Zechman was doing. Similarly, Flanagan's telling Schorr that someone in the drivers' room wanted to speak to him suggests a possibility of cooperation with the UTU drive, since that was where the UTU organizers were soliciting signatures. However, that fact can hardly support the Board's conclusion that "[w]hen the drivers came in to the HAML facility, they were directed by chief dispatcher Flanagan to the UTU representatives . . . ." Schorr seems to have been the only employee to testify that he was "directed" to the drivers' room, and even if it can be reasonably inferred that Flanagan knew who wanted to see Schorr and for what purpose, there is no evidence that Flanagan's actions had any coercive effect.[15]

We are left, then, with Flanagan's statement to Bien on the morning of November 3: "I am going to have to cut you a couple short. We are down here getting people signing cards." By itself that statement does not establish a violation of the Act, since the record demonstrates that the Teamsters was also soliciting signatures that day and thus any decision to curtail dispatching drivers would have benefited both unions. Moreover, even viewing Flanagan's statement together with the weaker evidence of assistance discussed above and in light of H.A.M.L.'s preference for UTU, as shown by the haste with which the company recognized and negotiated with that union, we do not believe that this evidence establishes such direct support and assistance to UTU as to interfere with the employees' freedom of choice. Thus, we conclude that H.A.M.L. did not violate § 8(a)(1), (2), and (3) of the Act in according recognition to UTU and in concluding a contract with it that contained a union security provision.

The Board also found that H.A.M.L. committed an independent violation of § 8(a)(1) of the Act by requesting an employee to engage in surveillance of the union activities of other employees, and we hold that this finding is supported by substantial evidence on the record. H.A.M.L. employee Coudray testified that during the afternoon of November 5, Flanagan asked him to spy at a Teamsters' meeting that night. Coudray went to the meeting and reported back to Flanagan the following morning, and was allegedly told to call Kilcoyne and tell him what had occurred. Kilcoyne testified that Coudray did in fact call him and tell him about the meeting, although he replied to Coudray that the

---

15. In Department Store Food Corp. of Pennsylvania v. NLRB, *supra*, this court upheld the Board's conclusion that it was an unfair labor practice for an employer to direct new employees to a union representative during the checking-in process. We reasoned that in such a situation those employees could reasonably believe that, as a condition of employment and as part of the checking-in process, the company wanted them to sign the union's authorization cards and that the company's assistance thus impaired the employees' right to choose freely whether or not they wanted to join the union. In this case, H.A.M.L.'s employees were not subjected to any comparable pressure.

information was unsolicited, that he really was not interested, and that he had given instructions to Flanagan not to get involved with the union business but to stay out of it and just do his own job.

It is well established that surveillance of the type described by Coudray is conduct prohibited by § 8(a)(1) of the Act. See NLRB v. Historic Smithville Inn, 414 F.2d 1358, 1359–1360 (3d Cir. 1969), cert. denied, 397 U.S. 908, 90 S. Ct. 904, 25 L.Ed.2d 88 (1970); NLRB v. Fishman & Sons, 278 F.2d 792, 796 (3d Cir. 1960). However, H.A.M.L. argues that the Board erred in crediting Coudray's testimony. After a careful review of the record, including the Administrative Law Judge's discussion of this point,[16] and in view of our extremely limited role in reviewing the credibility of Board witnesses, NLRB v. Local 420, Plumbers, *supra* at 328, we find this argument to be without merit.

H.A.M.L. also contends that the finding by the Board that Flanagan is a supervisor is not supported by the evidence and that his actions were, therefore, not attributable to H.A.M.L. We disagree. Although there is some evidence suggesting employee status,[17] it does not compel such a finding for the record also indicates that Flanagan is salaried, is the sole dispatcher for H.A.M.L.'s 55 drivers, has authority to assign overtime and determine whether to send drivers to Suburban from H.A.M.L. when requested by Suburban's dispatchers or officials, is the person whom employees call when they are unable to work, occasionally adjusts minor grievances, and performs some of Manager Kilcoyne's functions when the latter is absent.

For the foregoing reasons, the petition for enforcement will be granted as to that part of the Board's order concerning H.A.M.L.'s violation of § 8(a)(1) of the Act for having requested an employee to engage in surveillance of the union activities of other employees. As to all other matters, the petition for enforcement will be denied and the petition for review granted. The case will be remanded to the Board for further proceedings not inconsistent with this opinion.

---

ADAMS, Circuit Judge (dissenting):

The symbiotic relationship between legal norms and factual contexts appears perhaps in its starkest form in the field of labor law. The principles governing the affairs of employers and employees have largely evolved through attempts by legislatures, courts, and administrative tribunals to contain within a comprehensible set of rules the complicated undulations of labor-management-relations. Since our understanding of the usually complex factual situations is ac-

16. After considering the fact that Coudray did call up Kilcoyne and tell him about the meeting, the Administrative Law Judge said: "I cannot conceive of Coudray at that time attempting to build up a case against HAML by calling Kilcoyne, as he did, and manufacturing a story about Flanagan having told him to call. I must conclude, accordingly, that Flanagan did so tell him."

H.A.M.L. now argues, since the contract between H.A.M.L. and UTU had already been executed the day before, that there was no reason for Flanagan or anyone else to have Coudray spy on a Teamsters' meeting on November 5. This argument is not persuasive. H.A.M.L. might very well have wanted to know what actions the employees supporting the Teamsters planned to take in response to that contract.

17. It is undisputed that Flanagan had no authority to hire, fire, or otherwise discipline employees, or to fix working conditions such as vacations, holidays, or hours of work; only Kilcoyne had such authority. In addition, Flanagan testified that he drove a bus fairly regularly, was paid hourly like the drivers, and received the same rate of pay, attended no supervisory meetings, received the same vacation and fringe benefits as the drivers, did not participate in the negotiation of the contract, was not paid if he was out sick, holds no stock in H.A.M.L., did nothing without Kilcoyne's approval, and did not feel part of the management. Since the Administrative Law Judge found Flanagan's credibility suspect on other matters (30a, n. 19), he was, of course, free to determine to what extent he would credit Flanagan's testimony on this issue.

quired through a detached perusal of a written record, it is not surprising that, on occasion, we, as judges, differ as to the applicable legal principles. Separate opinions, like mine in the instant case, seem an inevitable product of the intricate tapestry of rule and fact constituting the law in this field.

Thus, while I agree with the majority's disposition of the charges of unfair labor practice against Suburban, I disagree with its conclusion that the activities of H.A.M.L. surrounding the recognition of UTU and its subsequent expedited negotiation of a collective bargaining agreement with UTU did not constitute an unfair labor practice.

### 1. The Unfair Labor Practice Rulings Against Suburban

As for the decision with respect to Suburban, since the administrative law judge expressly disavowed this Court's reasoning and result in *Swift* and since he offered no factual basis apart from Suburban's awareness of the decertification petition for a conclusion that the employer believed that a real question of representation existed, I am constrained to agree with the majority that Suburban did not commit an unfair labor practice in reaching an agreement with UTU while the decertification petition was pending.

*Swift* holds in essence that the filing of a decertification petition and "an administrative determination that a hearing thereon should be held" is not sufficient evidence to establish the employer's belief that a real question of representation exists. In *Midwest Piping*, the Board had held, prior to *Swift*, that once a representation petition had been filed with the Board, the employer's act in recognizing one of two competing un-

ions amounted to "unlawful assistance . . . which interfered with, restrained, and coerced its employees in the exercise of rights guaranteed in section 7 of the Act." Despite some degree of agreement with the *Swift* rule in other circuits,[1] the Board has continued to decide cases on the basis of the *Midwest Piping* rationale.

The concerns underlying the Board's resistance to the *Swift* rule, thus accounting for its adherence to the *Midwest Piping* doctrine, are not altogether illusory. The doctrine according to the Board is but "a direct outgrowth of the parent doctrine of employer neutrality in matters relating to employees' choice of bargaining representatives."[2] The doctrine promotes the general objective of preserving the employees' free choice in several ways. First an election would appear to be a better test of employee sentiment than authorization cards or other, less formal evidence that an incumbent union retains majority status.[3] Second, once an employer has recognized and begun to bargain with one of two competing unions, the legitimacy thereby likely conferred in the eyes of some employees on the chosen union makes it very difficult, in subsequent Board proceedings, if any there be, to determine whether the chosen union had attained majority status prior to the act of recognition.[4] Hence, the *Midwest Piping* doctrine serves as a prophylactic device insofar as it discourages recognition prior to a Board-conducted election, thereby avoiding the subtle effects pre-election recognition may well have on employee sentiment.

However, several policy considerations support the *Swift* doctrine. First, permitting the employer to continue to bargain with an incumbent union avoids the

1. *See, e. g.*, NLRB v. Midtown Service Co., 425 F.2d 665, 669 (2d Cir. 1970); Getman, The Midwest Piping Doctrine: An Example of the Need for Reappraisal of Labor Board Dogma, 31 U.Chi.L.Rev. 292 (1964).

2. NLRB v. National Container Corp., 211 F. 2d 525, 536 (2d Cir. 1954).

3. *See* NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Note, Union Authorization Cards, 75 Yale L.J. 805 (1966).

4. *But cf.*, Getman, The Midwest Piping Doctrine: An Example of the Need for Reappraisal of Labor Board Dogma, 31 U.Chi.L. Rev. 293, 305–311 (1964).

disruption in the collective bargaining process occasioned by insubstantial claims to majority status asserted by nonincumbent unions. Second, assuming that the incumbent union does, in fact, enjoy majority status, the employees' wishes are, in effect, frustrated during that period required to conduct the representation election which *Midwest Piping* mandates in cases when a representation petition has been filed. Third, some would contend that labor-management relations have matured over the years to the extent that the danger of the successful establishment of a union which is unduly solicitous of the employer's wishes and needs is minimal and, therefore, the evils of premature recognition and continued bargaining with an incumbent union whose majority status has been challenged by a representation petition are mitigated.

None of the factors tending to support rejection of the *Swift* rule are of recent vintage. This Court in *Swift* no doubt weighed these considerations in reaching its decision. Therefore, it would not appear appropriate, at least at this time, to question the rule.

### 2. *The Unfair Labor Practice Against H.A.M.L.*

The H.A.M.L. situation is somewhat different. The H.A.M.L. workers were not represented by any union before November 3, 1971. At that time, UTU and the Teamsters were both engaged in organizational efforts. There is no indication in the record, apart from the usually suspect authorization cards, whether UTU had attained, at any time, actual majority status. The Board's order with respect to H.A.M.L. required the employer, *inter alia*, to refrain from treating UTU as its employees' representative. The enforcement of this order appears to be the prelude to a Board-conducted election.

Thus, the *Swift* rule and the *Midwest Piping* doctrine, which deal with petitions *to decertify* an existing union, are somewhat inapposite. Instead, we must resort to more pristine standards for determining whether the employer's recognition of UTU constituted illegitimate assistance to that union, standards largely unsullied by the conflicting glosses of *Swift* and *Midwest Piping*.

Section 7 of the National Labor Relations Act guarantees employee-free choice in the selection of a bargaining representative as well as the right to reject all putative representatives. The employer's awareness that a representation dispute exists is some evidence that its action in recognizing one of the disputants prior to an election interfered with the employees' section 7 rights or contributed to the support of the chosen union.[5] Yet, *Swift* makes clear that if such an awareness is acquired solely through the filing of a representation petition, bargaining with the incumbent union does not amount to an unfair labor practice.

It is arguable, however, that when there is a closely contested representational dispute in a bargaining unit previously unrepresented, such as that comprised of H.A.M.L. employees, the impact of recognition on employee freedom of choice is perhaps more devastating than when an employer merely continues to bargain with an incumbent union despite the existence of a decertification petition. Nevertheless, when employer awareness of a representational dispute and its subsequent recognition of one of the competing unions are coupled with a finding of acts that tend to favor one of two rival unions or to render suspect the employer's motivations in recognizing one of the unions, it becomes difficult to conclude that the employer has not interfered with employee choice.

In the case at hand, the administrative law judge relied primarily on the unusual haste surrounding the acquisition of an authorization card majority, the quickness of the employer's recognition, and the swiftness of the negotiation of a collective bargaining agree-

---

5. 29 U.S.C. § 158(a)(1) & (2).

ment. The majority concludes that the rapid pace of these events did not interfere with the employees' freedom of choice because the UTU represented an uncoerced majority of the workers. This assertion of uncoerced majority status is founded solely upon the authorization cards submitted by UTU to H.A.M.L. Viewed against the questionable reliability of authorization cards as an indication of employer sentiment, I cannot regard the frantic efforts on the part of UTU and H.A.M.L. as "precisely the sort of cooperation that it is the policy of the Act to foster."[6] Instead, the circumstances surrounding the negotiations between H.A.M.L. and UTU, coupled with other factual findings of the administrative law judge, would seem sufficient to support the Board's inference that H.A.M.L.'s actions had the effect of interfering with the employees' freedom of choice.

The majority appears to agree that other findings of the administrative law judge are "supported by substantial evidence on the record considered as a whole."[7] Findings that H.A.M.L. knew about the Teamsters' organizational activities and that H.A.M.L. suggested that UTU begin to organize in response thereto, do, in my judgment, shed substantial light on the intended and, in all probability, actual effects of the expedited recognition and negotiations.

Despite the concession by the administrative law judge that "the evidence of direct assistance in obtaining signatures on the mimeographed UTU 'authorizations' is not particularly strong," there appears to exist a sufficient factual predicate to support a conclusion that H.A.M.L.'s assistance to UTU amounted to a violation of sections 8(a)(1) and 8(a)(2). Also, because of the existence of a union security provision in the contract, there would seem to be a rational basis for the conclusion that section 8(a)(3) has been violated as well.

In sum, I cannot conclude that "the Board's factual inferences [with respect to H.A.M.L.] are so irrational they cannot stand. . . ."[8] Thus, I would permit enforcement of the Board's order to the extent it is intended to remedy unfair labor practices committed by H.A.M.L.

In all other respects, I join the opinion of the majority.

---

6. Majority Opinion at 86.

7. 29 U.S.C. § 160(f); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

8. Department Store Food Corp. v. NLRB, 415 F.2d 74, 77 (3d Cir. 1969).