NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

GREAT EASTERN COLOR LITHO-GRAPHIC CORP., Respondent.

No. 53, Docket 27470.

United States Court of Appeals Second Circuit.

Argued Oct. 19, 1962.

Decided Nov. 1, 1962.

A. Brummel, National Labor Relations Board, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallett-Prevost, Assistant General Counsel, and Melvin Pollack, Washington, D. C., on the brief) for petitioner.

James E. Birdsall of Warner & Birdsall, New York City, for respondent.

Before WATERMAN, HAYS and MARSHALL, Circuit Judges.

HAYS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order based upon a finding of violation of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act (29 U.S.C. § 158(a) (1) and (3) ). We grant enforcement.

■ Respondent operated a printing plant in Poughkeepsie, New York, employing about 40 men. In the late summer of 1960 a union sought to organize the employees. During the organizing campaign respondent, through its president, Louis Perretta, his son Frank Perretta, general manager of the plant, and Peter L'Episcopo, foreman on the night shift,[1] expressed vigorous opposition to unionization, as it had a right to do. However, a number of the statements made by management representatives overstepped the limits prescribed by Section 8(c) of the Act (29 U.S.C. § 158(c) ) and entered the forbidden area of coercion. Thus quite apart from the discharges which the Board found violative of both Section 8(a) (1) and Section 8 (a) (3), the coercive statements of the employer constitute in themselves a violation of Section 8(a) (1). Moreover against this background of coercive statements and hostility to the union, the employer's persistent interrogation of employees as to their union membership and the union membership of fellow employees was also properly found by the Board to be violative of Section 8(a) (1).

The difficult question presented is whether the evidence supports the finding of the Board that three employees, Cross, Pellizzari and Case, were discharged for

---

1. Respondent sought to show that L'Episcopo was not a "supervisor" within the meaning of Section 2(11) of the Act (29 U.S.C. § 152(11). The evidence adduced by the board amply supports its findings on this score.

union activity in violation of Section 8 (a) (3).

The crucial date in the case is September 10, 1960. On that day a meeting of the Union was held and a number of the employees attended. L'Episcopo, who was a member of the union[2], was present at the meeting and reported on it to the Perrettas, giving the names of at least some of those in attendance. The anti-union activity of the employer followed immediately after this meeting and the three men in question who to the employer's knowledge were members of the union were discharged during the following week.

As to Cross the evidence shows that on Friday, September 9, he was asked to work overtime on September 10 and refused. However at the employer's insistence he did report for work on September 10, though he left early. He also worked on Monday, September 12 and on Tuesday, September 13. At the end of his shift on Tuesday he was discharged. According to uncontradicted testimony, which was credited by the trial examiner, a few hours before Cross was discharged Louis Perretta, pointing to Cross, said to his son, Frank:

"There is the guy that called me up begging for a job and I hired him and he's joined the Union, * * *. That's all right, he can get a job someplace else."

Pellizzari was discharged on the same day as Cross, i.e. the Tuesday after the union meeting of Saturday, September 10. He was ostensibly discharged for smoking in the plant, although the evidence shows that he had smoked in the plant for years and that other employees and, indeed, the representatives of management also smoked in the plant. In spite of Pellizzari's well-known violations of the no-smoking rule he received a raise and commendation for his work shortly before his discharge. He testified, and his testimony was uncontradicted and was credited by the trial examiner, that during the night shift on September 10:

"[L'Episcopo] asked me if I had joined the union, and I told him no, and he said he knew I was lying, that he knew I was in the union, that he was in the union a great number of years and it didn't help him and would not help me and in a non-union shop I would move up faster, would not have to spend time in an apprenticeship, that I would be better off not being in a union shop.

"Q. What happened then? A. Well, Louis Perretta was standing about three feet away on the same press and he pounded his fist on the table and said he did not want the * * * union in the shop."

Case was discharged on the Friday following the union meeting of Saturday, September 10. The ostensible reason for the discharge was an altercation between him and Louis Perretta which took place in a restaurant the afternoon preceding the discharge.[3] According to Case's uncontradicted testimony, credited by the trial examiner, L'Episcopo said to Case on September 15, the day before his discharge:

"Louie [Perretta] knows you're in the Union, you should go up and tell him that you were in the Union, you realize it was a big mistake but you thought it was right at the time. When you tell him, you'll be back in his good graces."

And the next day as Case was about to leave the shop after his discharge, Louis Perretta said to him:

"The next time I meet you, kid, you better be a strong arm, * * * you were a strong arm last night, and you were a strong arm when you handed out those papers."

The remark about handing out papers clearly referred to Case's having distrib-

---

2. In the printing trades it is customary for foremen to be members of the union.

3. Case had gone to the restaurant from a meeting of the union. While there is no testimony establishing that Perretta knew of Case's attendance at this union meeting, as distinguished from the meeting on the previous Saturday, it seems to us not unlikely that Perretta was informed of it.

uted cards at the union meeting of September 10.

■ The issue before us is not, of course, whether or not there existed grounds for discharge of these employees apart from their union activities. The fact that the employer had ample reason for discharging them is of no moment. It was free to discharge them for any reason good or bad, so long as it did not discharge them for their union activity. And even though the discharges may have been based upon other reasons as well, if the employer was partly motivated by union activity, the discharges were violative of the Act.[4] If, for example, the employer had long contemplated discharging Pellizzari for his inveterate smoking in violation of plant rules, and his joining the union was merely the final straw, the discharge must be held to be improper.

■ The finding of unfair labor practices with respect to these discharges rests wholly on the evidence as to the remarks of management representatives made at or about the time of the discharges. While this evidence is not as compelling as it might be it gains considerably not only in credibility but in substantiality when it is set in the background developed by other evidence. See Paramount Cap Mfg. Co. v. National Labor Relations Board, 260 F.2d 109 (8th Cir., 1958); National Labor Relations Board v. Van Deusen, 138 F.2d 893 (2d Cir., 1943). All the discharges occurred within six days of the union meeting of September 10. As we have already found there is ample evidence of hostility toward the union which was brought to a head by the reports to the employer of this meeting. For the most part the employer's coercive statements were made and its persistent interrogation took place in the few days immediately following the meeting.

The testimony as to the statements of the employer in connection with the discharges was uncontradicted. It was credited by the trial examiner who had, of course, the opportunity to observe the demeanor of the witnesses. See National Labor Relations Board v. Universal Camera Corp., 190 F.2d 429 (2d Cir., 1951). It is not so inherently unbelievable, especially in the light of the evidence as to the employer's hostility to unionization, that we can say that the trial examiner could not properly have given it credence.

The employer introduced evidence to show that sometime in late August, 1960, the principal customer of the respondent complained of the character of respondent's product and threatened to withdraw his custom. Although much was sought to be made of this warning as a basis for the discharges, it must be noted that the urgency of reform did not result in any discharges until after the lapse of more than two weeks and after the union meeting of September 10.

■ We have discussed these discharges at rather greater length than we ordinarily would, because to our minds the evidence supporting the Board's findings is very close to the border line of the substantial evidence test. Keeping in mind, however, that it is not for us to determine how we would have decided on the evidence presented [5] we have carefully reviewed the whole record [6] and on the basis of that record we cannot say that the Board's findings are not supported by substantial evidence.

Enforcement granted.

4. "If employees are discharged partly because of their participation in a campaign to establish a union and partly because of some neglect or delinquency, there is nonetheless a violation of the National Labor Relations Act," National Labor Relations Board v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2d Cir., 1954).

5. Independent Employees Ass'n of Neptune Meter Co. v. National Labor Relations Board, 158 F.2d 448 (2d Cir., 1946); Sperry Gyroscope Co. v. National Labor Relations Board, 129 F.2d 922 (2d Cir., 1942).

6. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).