**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.**

No. 77, Docket 32224.

United States Court of Appeals
Second Circuit.

Argued Nov. 7, 1968.

Decided July 3, 1969.

Nan C. Bases, William Wachter, Attys., National Labor Relations Board, Arnold Ordman, General Counsel, Dominick L. Manoli, Assoc. General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, for petitioner.

Bruce H. Simon, Eugene S. Friedman, Cohen & Weiss, New York City, for respondent.

Before LUMBARD, Chief Judge, MEDINA and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge:

The National Labor Relations Board (Labor Board) seeks enforcement of its order of June 23, 1967 requiring respondent Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the union) to reinstate employee James L. Melillo, the charging party, to the seniority position the Executive Board of the union had granted him on January 25, 1966 and to make him whole for any loss of pay he may have suffered by reason of the rescission of that grant on March 29, 1966 after a hearing held March 3, 1966. We grant enforcement.

The major question presented here is whether the union legitimately stripped employee Melillo of the seniority status it had granted him because he had worked as a supervisor, or whether his seniority was taken away because it wanted to punish him for the anti-union activities he had engaged in while he had been a supervisor.

Melillo began working for Lizza and Sons in 1950 and by 1951 he had become a truck driver and a member of the union. He was a truck driver until 1959 when he was forced, upon doctor's orders, to give up driving because of an old leg injury. He then became a "runner" for Lizza, and therefore a representative of management, though he remained a member of his union and regularly paid his dues.

By the summer of 1965 Melillo's leg had healed to the point where he could resume driving. When he asked Al Lizza, president of Lizza and Sons, if he could drive again he was told to go through the union. Melillo then submitted a letter to the union's Executive Board requesting reinstatement of his driver status with full seniority. The Executive Board held a hearing upon this request and awarded Melillo his full seniority. This placed him No. 13 on the seniority list. There are no minutes of these proceedings but Geoghegan, the president of the union, testified that three members of the union appeared at the hearing and charged Melillo with anti-union activities.

Subsequently, the drivers, especially all those who came below Melillo on the seniority list, strenuously objected to the Executive Board's action. Geoghegan told them to put their charges against Melillo in writing. This they did. The Executive Board then held a second hearing, reversed itself, and deprived Melillo of the seniority previously awarded him. The letter apprising Melillo of this action did not give any detailed explanation for this decision, and though Geoghegan in his later testimony before the Trial Examiner of the Labor Board "emphasized the fact that Melillo had acted as a management agent and had occupied a position outside the unit" the record of the second hearing did not disclose the basis or the reason for the denial of seniority to Melillo.

Based upon the minutes of the second hearing, together with the other testimony before him, the Trial Examiner found that there had been no unfair labor practice discrimination against Melillo, for he was denied his former place on the union's seniority list on the legit-

imate ground that he had been a management representative for five years. He recommended that the proceedings be dismissed. The Labor Board adopted the factual findings of the Trial Examiner but disagreed with the conclusions he drew from the facts. Therefore, the Labor Board did not follow his recommendation and did not dismiss the case but instead ordered the union to restore Melillo to full seniority and to make him whole for any loss of wages he may have suffered. The record contains substantial evidence to support the Labor Board's conclusions.

■ A preliminary argument made by the union is that it is logically inconsistent for the Labor Board to find that the union deprived Melillo of his seniority without first deciding whether he was ever entitled to seniority. The cases the union cites for the proposition that a determination of the existence of seniority must precede a determination whether seniority has been withdrawn are all cases in which the question of the existence of seniority turned upon an interpretation of the collective bargaining agreement. E.g., Oddie v. Ross Gear and Tool Co., 305 F.2d 143 (6 Cir. 1962). Here, the question of Melillo's seniority was not covered by the agreement. The Labor Board, therefore, was not faced with a question of interpreting a contract; but rather with whether a union which had assumed the task of determining an employee's seniority performed this task in a discriminatory fashion. If the union so discriminated it violated the Act, even in the absence of an independent Labor Board determination of the employee's actual seniority status.

■ The principal question before us, therefore, is whether there was sufficient evidence in the record for the La-

bor Board to have determined that the union discriminated against Melillo because of his anti-union activities. The union argues that, once the Labor Board accepted the Trial Examiner's findings, it was improper for it to upset his conclusions. We find, however, that, in light of the record, the Labor Board's action was proper. It is especially significant that the January 31, 1966 letter signed by sixteen members of the union, while somewhat rambling in content, definitely charges Melillo with anti-union activities while he was a supervisor. It was this letter, presented to the union's Executive Board within six days after the announcement that Melillo was to resume his former seniority status, that forced the second hearing. The letter stated that from the time when Melillo decided his job with the company was a steady one and that he would stay on as a company man he "has been anti-union." It also contained much about the discharges of several drivers which had been allegedly caused by Melillo while a "company man," and, in this connection, there is reference to his hiring and firing activities. Perhaps the most telling charge was the representation that during strikes in 1959 and in 1961 he called drivers at their homes and threatened them that unless they came in to work he would hire non-union men and break the strikes.

Of course it is impossible to know the real motive behind a party's actions in such situations. Nevertheless, there can be little doubt that there is substantial evidence from the testimony at the Executive Board's second hearing that Melillo's anti-union activities played at least *some* part in the union's final determination to refuse him his seniority.[1] Indeed, Geoghegan admitted at the unfair labor practice hearing before the Labor Board's examiner that "all" of the union

---

[1]. For example, at page 8 of that transcript, the following dialogue occurred:

Brother Livolski: My name is Livolski. This is a seniority job. Am I right or wrong?

Chairman Geoghegan: Of course it is. You know it is.

Brother Livolski: How does a man hold seniority?

Chairman Geoghegan: Let's not get into that. Let's not get into that. Do you have anything to say on this complaint?

Mr. Livolski: I am out of order.

members present at the meeting accused Melillo of being anti-union. In analogous situations where either a proper or an improper reason may have been the basis for an action taken in a labor dispute, we have held that there is a violation of the Act if the improper motive is only *partially* responsible for the action. E.g., NLRB v. Milco, Inc., 388 F.2d 133, 138 (2 Cir. 1968); NLRB v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2 Cir. 1954). We so hold here.

■ Even if it is assumed that Melillo's union denied seniority status to Melillo because of his anti-union activities, the union, *arguendo*, advances two further arguments in opposition to the enforcement of the NLRB order. The first is that Melillo's activity was not "protected activity" because it was engaged in while Melillo was a supervisor.[2] In support of this position the union cites several cases where it has been held that an employer could discriminate against an employee for pro-union activity engaged in by the employee during a time when he had supervisory status by refusing later to hire him as a production worker. NLRB v. Columbus Iron Works Co., 217 F.2d 208 (5 Cir. 1954); Texas Co. v. NLRB, 198 F.2d 540 (9 Cir. 1952); cf. Gibbs Automatic Division, Pierce Industries, Inc., 129 N.L.R. B. 196 (1960). The cited cases are distinguishable because the party practicing the discrimination here is not an employer exercising his right to refuse employment to a job applicant, but a union setting the seniority of a member by measuring the extent of his commitment to the union and to union policies. The general policy of the Act is to dissuade discrimination against an employee for having exercised his right to express his views either for or against a union. That general policy should govern here.

Obviously neither the rule nor the rationale behind the rule in the *Texas Co.* and *Columbus Iron Works* cases has any application to the situation before us now.

■ The final point the union urges, *arguendo*, is that even if it denied Melillo seniority because of his anti-union activities it did not violate the Act for the denial neither interfered with, restrained, nor coerced the employees' choice of their § 7 rights [§ 8(b) (1) (A)] or caused the employer to discriminate against Melillo for the purpose of encouraging or discouraging membership in the union [§ 8(b) (2)]. There is, however, no substance to these assertions, for it has often been held that a union violates an employee's § 7 rights when it causes the employer to reduce an employee's seniority status for an illegitimate purpose such as Melillo's alleged anti-union activities here. Radio Officers' Union v. NLRB, 347 U.S. 17, 25–26, 74 S.Ct. 323, 98 L.Ed. 455 (1954). The necessary effect of such action by the union is to serve notice upon all employees that an employee's challenge to the union's authority could result in the loss of his job security or even the loss of his job.

To support its position that § 8(b) (1) (A) and § 8(b) (2) are not violated, the union cites New York Typographical Union Number Six et al., 144 N.L.R.B. 1555 (1963), aff'd, Cafero v. NLRB, 336 F.2d 115 (2 Cir. 1964); and Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). In neither of these cases, however, was there any hint that the union was motivated by an illegitimate reason for disciplining the employee such as the motivation here. Thus, in the *Typographical* case, the withdrawal of the employee's seniority was based on the legitimate ground that

**2.** The union had not presented this issue below, and the Labor Board argues that it is precluded by § 10(e) of the N. L. R. A. from raising it now. Inasmuch as the union won before the Trial Examiner it had no cause to urge this or any other point before the Labor Board. It is proper, in such situations, to raise the point for the first time in the Court of Appeals. NLRB v. Local 138, Internat'l Union of Operating Engineers, AFL-CIO, 293 F.2d 187 (2 Cir. 1961); NLRB v. Richards, 265 F.2d 855 (3 Cir. 1959).

since he secretly held an outside job, the union could properly allocate the work to those who needed it most. In no way could that action be interpreted as a warning to those who opposed the union. On the other hand, in the present case the union was at least partially motivated by the employee's anti-union activities, and the order of the Executive Board denying Melillo seniority could easily influence other employees in the exercise of their § 7 rights.[3]

Therefore, the Board's order is enforced.

3. The union also urges Texas Co. v. NLRB, 198 F.2d 540 (9 Cir. 1954), discussed *supra*, to support its argument here that § 8(b) (2) is not violated. We have already stated our reasons for not following that case, however, and need not restate them here.