**WATERBURY COMMUNITY ANTENNA, INC.,**
Petitioner-Cross-Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent-Cross-Petitioner.

Nos. 943, 944, Dockets 78–4008, 78–4030.

United States Court of Appeals,
Second Circuit.

Argued May 1, 1978.

Decided Oct. 27, 1978.

Albert H. Turkus, Washington, D. C. (Thomas H. Wall, Marshall F. Berman, Washington, D. C., of counsel), for petitioner-cross-respondent.

Alan Banov, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman, N. L. R. B., Washington, D. C., of counsel), for respondent-cross-petitioner.

Before FEINBERG and MESKILL, Circuit Judges, and PORT,* District Judge.

MESKILL, Circuit Judge:

This case is before us upon a petition for review and a cross-application for enforcement of an order of the National Labor Relations Board. The principal issue is whether the record contains substantial evidence to support the Board's finding that the petitioner violated § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), by discharging one of its employees.

---

* Hon. Edmund Port, Senior District Judge of the Northern District of New York, sitting by designation.

## FACTS

Petitioner, Waterbury Community Antenna, Inc., is a Connecticut corporation and a subsidiary of Sammons Communications, Inc., of Dallas, Texas. In 1974, petitioner was granted franchises from the Connecticut Public Utilities Commission, now the Public Utilities Control Authority, to build and operate cable television systems in Waterbury, Plymouth and Middlebury, Connecticut. The franchises required petitioner to build all three systems within five years and to build at least twenty percent of the total of the three systems each year. The Waterbury system, which represents eighty-seven percent of the total, was started first and was finished in two years. In the summer of 1976, petitioner had no immediate plans to begin building the Plymouth and Middlebury systems.

The cable television system receives television signals from the airwaves, amplifies them, and feeds them into a coaxial cable which carries them to individual subscribers' television sets. The coaxial cable is attached to a "strand," a non-electric line which is attached to telephone poles owned by the Southern New England Telephone Company. Petitioner pays for the use of the poles by purchasing "licenses" covering about 400 poles each. The Waterbury system included thirty-three licenses; a thirty-fourth was added to permit petitioner to extend the system into Naugatuck. The Waterbury system was also divided into five segments for construction purposes. As each segment was completed, it could be "energized" and petitioner could begin to realize income.

The initial work on the Waterbury system was done by a subcontractor which performed a preliminary survey in early 1974 and produced strand maps indicating the telephone poles to which the strand should be attached. In March of 1974, John Baker, petitioner's general manager, arrived in Waterbury and took charge of all of petitioner's operations. About the same time, Michael Petruzzi, petitioner's chief technician, and a former employee of petitioner's parent, Sammons, began work in Waterbury.

The actual construction of the system was contracted out to Magnavox, which in turn subcontracted the work to Payne Construction Company. Before Payne could begin construction, a survey of the telephone poles had to be conducted to determine what work would have to be done to each pole in order to ensure that petitioner's cable would be attached in a manner that would conform to state and federal regulations. This pole survey was begun by a Sammons employee named Bill Boone. In late August or early September, 1974, Boone suffered a heart attack and for about two weeks Baker took over his responsibilities. On September 26, 1974, Baker hired Ben Tabaka.

It is undisputed that Tabaka's job was a temporary one: "Baker intended and Tabaka understood that Tabaka was being hired in connection with plant construction only and that his job would end when the work for which he was being hired came to an end." [1] Because of a back injury, Tabaka was unable to perform normal tasks, such as climbing telephone poles, required of post-construction operating personnel, such as installers or repairmen. Baker gave Tabaka the title of construction engineer/draftsman. Forms completed by Baker at the time Tabaka was hired indicate that Tabaka was "Needed for Pole survey to replace Bill Boone" and that he was hired "to do pole survey with telco/Permit work & drafting." The pole survey consisted of a physical inspection, by Tabaka and a telephone company employee, of each telephone pole. With respect to each pole, they would note what, if anything, had to be done to ensure that the pole would conform to legal requirements when petitioner's cable was attached. Tabaka's immediate superior was Petruzzi.

In November, 1974, Payne began construction in areas where the pole survey was already finished. Tabaka and his telephone company counterpart continued to

---

1. Decision of Administrative Law Judge Blackburn at 4.

work on the pole survey at least through the spring of 1975. The pole survey appears to have been completed early in the summer of 1975. Baker's budget for 1975 did not provide for wages for Tabaka beyond July of that year. As the pole survey was being finished, Petruzzi assigned Tabaka the job of performing a "final inspection" of Payne's work to determine whether it had been done in accordance with specifications. The job was intended by Petruzzi "as a filler." Like the pole survey, the final inspection was performed in conjunction with a telephone company employee.

The subject of laying off Tabaka first arose sometime between July and September, 1975, and was apparently prompted by the fact that Tabaka had finished the work for which he had been hired but had nevertheless remained on the payroll beyond the time allowed for in the budget. At a meeting in Baker's office, Baker explained that he was anxious to cut costs and wanted to know how soon the temporary employee Tabaka could be terminated. Petruzzi argued that Tabaka should be retained to finish the final inspection. Baker agreed to this because he was anxious to expedite the completion of the final inspection. Petitioner paid the telephone company in advance based on estimates that were "usually a little heavy on the front end." Upon completion of the final survey, actual costs could be calculated, and this was expected to produce a refund for petitioner. In September, Tabaka asked Petruzzi about the possibility of a raise. Petruzzi told him that it was a bad time to make such a request because petitioner was trying to hold down expenses. Petruzzi explained that management had wanted to lay Tabaka off when the pole survey was complete but had been persuaded to keep him on until the final inspection was finished. In September or October, 1975, Baker prepared the 1976 budget; it made no allowance for wages for Tabaka. There is no evidence to indicate that Tabaka saw or knew of this budget. In early October, Tabaka contacted James Fraser, the president and assist-

ant business manager of Local 42 of the International Brotherhood of Electrical Workers, AFL–CIO.

Back in February and March of 1975, when petitioner had prepared to energize the first segment of its system, Baker had hired operational personnel, including installers and repairmen. During this initial period, petitioner had also relied on subcontractors to perform installations in order to avoid building up a large staff that would have to be reduced later. More employees were added to petitioner's payroll in September and October, 1975. By this time, petitioner had a total of twelve non-clerical employees, including installers, repairmen and Tabaka.

At Fraser's request, Tabaka arranged a meeting of petitioner's employees at a restaurant on October 21, 1975. Nine employees attended, including Tabaka, and all nine signed union authorization cards.[2] On October 22, Fraser sent a mailgram to Baker in which recognition was requested. The union filed an election petition with the Board on October 28. Two days later, counsel for petitioner sent a letter responding to the mailgram by declining to recognize the union and suggesting that an election petition be filed.

A representation hearing was held in Boston on November 12, 1975, to determine the appropriate bargaining unit. Tabaka appeared with Fraser and participated. Petitioner and the union litigated the question whether Tabaka should be included in the bargaining unit. Baker testified that Tabaka's job of construction engineer/draftsman would be abolished as soon as the final inspection was completed; his best estimate of when the final inspection would be completed was "around February." The parties also disputed whether Petruzzi should be included in the bargaining unit; the union argued that he was a supervisor, while the petitioner argued that he was a rank-and-file employee. In a decision issued on December 18, Acting Regional Director Robert N. Garner found that Petruzzi was a supervisor. He also found that Tabaka had a

2. A tenth employee signed a card on December 12, 1975.

"sufficient community of interest with the other employees." Curiously, he failed to mention the fact that Tabaka's job would expire within two months.

A number of significant events occurred between the meeting at the restaurant on October 21 and the announcement of the results of the representation case on December 18. During this period, petitioner's employees sought Petruzzi's views regarding the union on many occasions, and Petruzzi discussed the matter freely. A few days after the October meeting, an installer named David Wilson sought Petruzzi out in Petruzzi's office. Petruzzi told Wilson he knew about the meeting at the restaurant, and Wilson said that he had been present. Petruzzi asked Wilson what he thought a union could do for him, and Petruzzi asserted that he could handle grievances better than a union steward could. On other occasions, when employees asked about raises and educational benefits discussed when they were hired, Petruzzi said they would not be forthcoming until after the union situation was resolved because petitioner feared being accused of unlawful conduct.

Around the same time, at a meeting between Tabaka and another installer named John Harris, which occurred in Tabaka's office, Tabaka told Harris that if the company was not unionized Harris and two other employees would get laid off. Harris then went to speak with Petruzzi; he told Petruzzi what Tabaka had said, and he inquired whether it was true. Petruzzi said that Harris' fears were unfounded and explained that petitioner had deliberately used subcontractors for installations to avoid having to lay off its own installers after the initial surge of installations ended. Petruzzi also described to Harris, as he did to other employees on other occasions, the ways in which he thought a union might change the situation. He suggested that the practice of using company trucks to go to lunch might have to stop, and he said the employees might have to start punching a time clock.

One of the more important incidents occurred on November 28. In the morning,

while distributing paychecks, Petruzzi started discussing the union. Tabaka, who was working in an adjacent room, came into the technicians' room where Petruzzi and the others were and objected to the discussion of the union on company time. Petruzzi suggested that they all get together that evening to continue the discussion. He proposed that Fraser be invited to argue the union view. After work, the group went to Ro's Restaurant in Waterbury. Both Petruzzi and Tabaka were present but Fraser was not. Petruzzi explained both the pros and cons of joining a union. He said a union contract would allow them to know when their pay raises would occur and what their amount would be; it would also give them a system of seniority. On the other hand, he argued that merit raises in petitioner's discretion would benefit productive employees, while the job security of low producers could be jeopardized if the contract required employees to make a minimum quota of installations each day. He argued that existing conditions and wages were good, and he again speculated that if there were a union the employees' practice of using company trucks to go to lunch and of cashing their checks on company time might have to be discontinued. He also said again that a time clock might have to be installed and that the company's lenient attitude toward tardiness would likely end. He urged the employees to wait a year until deciding whether to join a union.

Tabaka argued the pro-union side, and he and Petruzzi got into a heated debate over Tabaka's role in the union campaign. Petruzzi accused Tabaka of wanting the union only for his own protection, and Tabaka denied this. Petruzzi's next remarks are best described by Administrative Law Judge Benjamin K. Blackburn:

> Petruzzi told Tabaka that his job might have lasted longer than it was going to if Tabaka had not brought the Union into the picture. He reminded Tabaka he had already persuaded Baker to extend Tabaka's job once. He said he could have found some more work for Tabaka to do after the final inspection with the telephone company was complete. He said,

now that the Union was on the scene, the matter was out of his hands.

(footnote omitted.) [3]

In early January, after the decision in the representation case, but before the election, Petruzzi again spoke with the installers in the technicians' room. He compared their wages with those of employees in a unionized cable television shop and said that a union contract would benefit low producers and hamper productive workers.

Tabaka worked on the final inspection with an engineer from the telephone company named Dennis Sullivan. The amount of field work Tabaka could do depended on the availability of Sullivan. When Tabaka was not in the field, his normal responsibilities included the preparation of informal work orders and the updating of various maps. On occasion he was given additional tasks to keep him busy. These included the designing of a floor plan for an apartment building that was to be fitted with a master antenna. He also was asked to design a strand map for a short extension of the cable television system. He finished both of these extra jobs.

In the fall of 1975, some construction errors were discovered, and, according to Tabaka, Petruzzi told him to "go out there in the field and check the whole area." Tabaka then began conducting an inspection independently of Sullivan in order to make sure that corrections that had been ordered after the final inspection were done properly. When Tabaka found errors, he would bring them to Sullivan's attention. Sullivan objected to this practice. He did not like being rushed by Tabaka during the first inspection, so that petitioner could get its refund sooner, only to discover that Tabaka had conducted yet another inspection on his own and found new errors. The practice was either discontinued or modified. As Sullivan explained, "I said, no way. I said when we look at that pole, that pole is going to be right or we're not going to leave that site until it is. And, that's the way it worked . . . ." In theory it would have been possible for Tabaka to continue his independent "final final" inspections after the conclusion of the joint final inspection.[4] As a practical matter,

3. Tabaka's version was as follows:

> [Petruzzi] said if I didn't bring up this business with the union, I could of had my job for another year, year and a half, so I says, you mean to tell me if this union, these boys didn't want a union, I could still have my job for a year, year and a half? He says, yes, he says maybe even two, but he said you started this trouble, he says, now things are going to be different.

As ALJ Blackburn explained, Tabaka's testimony was somewhat suspect not only because of his self-interest, but also because of "[h]is strained efforts to put the best possible gloss on all his testimony." Other employees gave a different version. According to Richard Moffo, Petruzzi said, "it was out of his hands—that he could have found work for him, but now it's out of his hands." John Harris recalled Petruzzi saying simply, "[t]hat when the system was completed that his job was over with." David Wilson testified that Petruzzi "said that he had been creating work for [Tabaka] to keep him on and [Tabaka] said thanks, Mike, I appreciate it. They were talking and Michael said he probably could have created more work for him. [sic] but that it was now out of his power." According to Wilson, Petruzzi never said how much work might have been created. It was Remo Ceniccola's testimony that Petruzzi "said to [Tabaka] since the union issue has flared up, Ben, he could have created work for Ben for at least a year but now it's out of his hands." According to ALJ Blackburn, "Petruzzi's version, couched in defensive terms, gives . . . the flavor of what was said."

> The Witness: I told him that I was sorry that it was going to happen but that his job was terminating and that because of the very unique situation that we had there was nothing I could do to prolong it. We were under an unusual set of circumstances I guess we still are and I don't pretend to understand them but—
>
> Judge Blackburn: Are you referring to the Union situation Mr. Petruzzi?
>
> The Witness: Yes.

4. Under questioning by ALJ Blackburn, Tabaka gave the following rather illuminating description of his role:

> Judge Blackburn: From your point of view, Mr. Tabaka, would there ever have come a time when you were—when your role in the construction of the system was finished? Would there ever have come a time when the construction of the system was done and that, all that remained to be done was something non-construction?
>
> . . . . .
>
> The Witness: It's a continuous thing—

however, by the end of the final inspection there were so few corrections to inspect that they could hardly have justified his continued employment. Some of the work Tabaka began to perform near the end of the final inspection was actually the responsibility of Magnavox. The construction contract between petitioner and Magnavox called for Magnavox to supply petitioner with a map of the system "as built." In effect, as the system neared completion, and as Tabaka updated his maps, he came more and more to perform a function that petitioner was paying Magnavox to perform. Thus, early in January, 1976, Petruzzi instructed Tabaka to turn over this work to Jack Reed of Magnavox.

On Tuesday, January 6, 1976, Sullivan and Tabaka returned to petitioner's office "acting like crazy people" and announced that they had finally finished the final inspection. Petruzzi told this to Baker, and Baker asked him if he had anything of consequence for Tabaka to do. Petruzzi said that he did not, so Baker decided to terminate Tabaka on the next payday, Friday, January 9, 1976. By that time, the actual construction was so complete that Robert Payne, the head of the construction subcontractor, was the only individual from that company remaining on the scene. About fifteen employees and Payne's son had left the project before Tabaka was discharged.

On the morning of January 9, Baker's secretary gave Tabaka two checks. He asked what was going on, and she took them back without explanation. Later in the day, Tabaka made an appointment with Payne to inspect some poles the following week. Still later, Baker called Tabaka into his office and told him he was being let go because the final inspection was complete.

Tabaka told Baker about his appointment with Payne and about another appointment with the Connecticut Department of Transportation concerning a conflict between one of the petitioner's cables and a traffic light. He also said he had work to do bringing maps up to date. Baker gave Tabaka two checks and a termination slip which said the reason for the discharge was lack of work. Petruzzi spent a total of about twelve hours in the six months after Tabaka left finishing up chores Tabaka was unable to complete. Shortly before Tabaka was laid off, Petruzzi had asked him to check telephone company records to make sure there was no double billing. Tabaka claimed that this was a six-month project. Petruzzi said a check of the entire system would have taken a week. In any event, he said he had asked Tabaka for a mere spot check, and when Tabaka discovered some duplication in work orders, Petruzzi had called the phone company and learned that such duplication was common and would not be reflected in the phone company's bill for actual work done. Tabaka did not mention this chore when he spoke to Baker. No one appears to have done any further checking of phone company bills after Tabaka left.

The union election was held on January 19. Twelve employees, including Tabaka, voted, and the union lost by a vote of eight to four. The union filed unfair labor practice charges against petitioner on January 20, 1976. A hearing was conducted before ALJ Blackburn in June. In his decision, ALJ Blackburn concluded that the petitioner had violated § 8(a)(1) of the Act by creating the impression that it was engaging in surveillance of its employees' meetings, by soliciting grievances from its employees, and by threatening its employees with discharge, loss of benefits, and more

Judge Blackburn: So, from your point—as far as you are concerned, you had an ongoing job because there would always be something that had to be done in connection with the—with the cables on the poles that would require—
The Witness: And, there is always new construction.
Judge Blackburn: —you would have to be there to look at it.

The Witness: Yes, I would say so.
Judge Blackburn: Okay.
The Witness: But, it's a continuous thing.
Thus, it would seem that the term "final final" is inadequate to describe what Tabaka considered his function to be. Sullivan's denomination is more accurate: "final, final, final, final, final, final, final inspection."

onerous working conditions. Each of these was based on the various statements made by Petruzzi between October, 1975, and January, 1976. After a lengthy analysis of the facts and circumstances surrounding Tabaka's discharge, ALJ Blackburn concluded that General Counsel had failed to sustain the burden of proving that petitioner had violated § 8(a)(3) of the Act because the record considered as a whole did not show that Tabaka would have been employed by petitioner beyond January 9 but for his union activities. In view of the § 8(a)(1) violations, however, a new election was recommended.

General Counsel filed exceptions to ALJ Blackburn's decision. A divided three-member panel of the Board modified that decision on December 20, 1977. The majority found that Tabaka would have been retained at least for a little while if he had not engaged in union activities. A bargaining order was issued, and Tabaka was awarded back pay and preferential rehiring rights. Member Murphy dissented. She agreed with ALJ Blackburn that Tabaka would have been discharged when the task for which his job had been extended was complete, regardless of his union activities.

## DISCUSSION

Section 8(a)(3) of the National Relations Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). This provision reflects the Act's general policy "to permit workers to exercise freely the right to join unions, to be active or passive members, or to abstain from joining any union at all without imperiling their right to a livelihood." *NLRB v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1163 (2d Cir. 1976), *citing Radio Officers' Union v. NLRB,* 347 U.S. 17, 39–42, 74 S.Ct. 323, 98 L.Ed. 455 (1954). In the interpretation of this provision, the courts have been mindful of "the employer's right to manage his enterprise." *American Ship*

*Building Co. v. NLRB,* 380 U.S. 300, 311, 85 S.Ct. 955, 964, 13 L.Ed.2d 855 (1965). Thus, the courts "have consistently construed the section to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed, may tend to discourage union membership." *Id., citing NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); *see NLRB v. Advanced Business Forms Corp.,* 474 F.2d 457, 464 (2d Cir. 1973), *citing NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45–46, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *NLRB v. Dorn's Transportation Co.,* 405 F.2d 706, 712 (2d Cir. 1969).

Proof of a violation of § 8(a)(3) requires proof of either encouragement or discouragement of union membership and proof of discrimination in employment. In the instant case, the Board found that Waterbury's discharge of Tabaka discouraged the other employees from voting for the union, and this finding is not challenged by Waterbury. Accordingly, we will focus our attention on the Board's proof of discrimination.

■ An accommodation of the interests of both the employer and the employee in a case such as this one "requires a delicate factual determination," *NLRB v. Park Edge Sheridan Meats, Inc.,* 341 F.2d 725, 728 (2d Cir. 1965), in which "the 'real motive' of the employer . . . is decisive." *NLRB v. Brown,* 380 U.S. 278, 287, 85 S.Ct. 980, 986, 13 L.Ed.2d 839 (1965), *quoting Associated Press v. NLRB,* 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953 (1937). *See Radio Officers' Union v. NLRB, supra,* 347 U.S. at 43. Although the general rule is that the burden rests with the General Counsel to prove discriminatory intent, it is clear that "some conduct carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent,' " *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967), *quoting NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 228, 231, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), and in

such cases, which involve conduct of an "inherently discriminatory or destructive nature," *NLRB v. Erie Resistor Corp., supra,* 373 U.S. at 228, 83 S.Ct. at 1145, the burden is on the employer to justify its conduct by showing " 'legitimate and substantial business justifications.' " *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967), *quoting NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 34, 87 S.Ct. 1792. However, there is nothing inherently discriminatory or destructive about the discharge of a single employee for cause, even if that employee is a union activist. It is well established that employees who are active in union affairs do not thereby obtain a special immunity from ordinary employment decisions. *Local 357, International Brotherhood of Teamsters v. NLRB,* 365 U.S. 667, 679, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) (Harlan, *J.,* concurring), *citing NLRB v. Universal Camera Corp.,* 190 F.2d 429 (2d Cir. 1951) (L. Hand, *J.*). See *Firestone Tire & Rubber Co. v. NLRB,* 539 F.2d 1335, 1337 (4th Cir. 1976); *NLRB v. Bausch & Lomb, Inc.,* 526 F.2d 817, 821 (2d Cir. 1975); *Cain's Coffee Co. v. NLRB,* 404 F.2d 1172, 1175 (10th Cir. 1968); *NLRB v. Billen Shoe Co.,* 397 F.2d 801, 803 (1st Cir. 1968); *NLRB v. Ogle Protection Service, Inc.,* 375 F.2d 497, 505 (6th Cir.), *cert. denied,* 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967); *NLRB v. Birmingham Publishing Co.,* 262 F.2d 2, 8–9 (5th Cir. 1959) (Wisdom, *J.*). At least where, as here, "the employer asserts a business justification for the layoffs, some basis for concluding that they were motivated at least partially by anti-union considerations must be shown." *NLRB v. M. H. Brown Co.,* 441 F.2d 839, 843 (2d Cir.

1971); *see Western Exterminator Co. v. NLRB,* 565 F.2d 1114, 1117 n.2 (9th Cir. 1977).

If partial motivation were the complete test, then the only issue before us would be whether there is substantial evidence on the record as a whole to support the conclusion that Tabaka's discharge was partly motivated by his activity on behalf of the union. If this were the issue, then its resolution would be simple. In all cases involving the discharge of a union activist, there is always sufficient evidence to pass such a test, and this case is no exception. It is unrealistic to expect management to ignore the fact that an employee is a union activist. When a union activist is discharged for cause, human nature is such that little employer disappointment can be expected. In such cases, more is required to support a finding of discrimination than an absence of remorse. *NLRB v. Fibers International Corp.,* 439 F.2d 1311, 1312, n.1 (1st Cir. 1971); *NLRB v. Milco, Inc.,* 388 F.2d 133, 138 (2d Cir. 1968); *NLRB v. Park Edge Sheridan Meats, Inc., supra,* 341 F.2d at 728. Thus, a "partly motivated" test, while accurate so far as it goes, must be incomplete, for it fails to account for situations where union activists are discharged for good cause.[5] Accordingly, we must determine what the other part of the test is and apply it.

■ If an employer asserts a business justification for the discharge of a union activist, a violation of the Act may nevertheless be found:

(1) if it appears that the reason put forward by the employer is a pretext, *NLRB v.*

---

**5.** ALJ Blackburn's recognition of this fact is reflected in the following passage in his decision.

> The fact that they were glad of an opportunity to end Tabaka's employment is, under those circumstances, coincidental only. It cannot supply the element of motive requisite to a finding of discrimination for union activities under the Act which is otherwise missing.

> In summary, the issue posed by the layoff of Ben Tabaka comes down to this. An employee was hired for a definite term which

> was to end at the occurrence of a particular event, i. e., completion of the pole survey. Before that event occurred, the term was extended until the occurrence of a second related event, i. e., completion of the telephone company final survey. Before the second event occurred, the employee engaged in known union activities. When the second event occurred, he was discharged. The employer was glad to be able to take advantage of this opportunity to get rid of the employee rather than extend the term a second time.

'Lizdale Knitting Mills, Inc., 523 F.2d 978, 980 (2d Cir. 1975); NLRB v. Advanced Business Forms Corp., supra, 474 F.2d at 463–64; NLRB v. Pembeck Oil Corp., 404 F.2d 105, 109–10 (2d Cir. 1968), vacated on other grounds and remanded sub nom. Atlas Engine Works, Inc. v. NLRB, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969); NLRB v. Milco, Inc., supra, 388 F.2d at 138; cf. Beazer v. New York City Transit Authority, 558 F.2d 97, 101 (2d Cir. 1977), cert. granted, —— U.S. ——, 98 S.Ct. 3121, 57 L.Ed.2d 1146 (1978); NLRB v. Local 294, International Brotherhood of Teamsters, 470 F.2d 57, 62 (2d Cir. 1972), or

(2) "[i]f employees are discharged partly because of their participation in a campaign to establish a union and partly because of some neglect or delinquency," NLRB v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2d Cir. 1954); see NLRB v. Advanced Business Forms Corp., supra, 474 F.2d at 463–64; NLRB v. George J. Roberts & Sons, Inc., 451 F.2d 941, 945 (2d Cir. 1971); NLRB v. M. H. Brown Co., supra, 441 F.2d at 843; United Aircraft Corp. v. NLRB, 440 F.2d 85, 91–92 (2d Cir. 1971); NLRB v. Gladding Keystone Corp., 435 F.2d 129, 131–32 (2d Cir. 1970); NLRB v. Midtown Service Co., 425 F.2d 665, 670–71 (2d Cir. 1970); NLRB v. Pembeck Oil Corp., supra, 404 F.2d at 109–10; NLRB v. Milco, Inc., supra, 388 F.2d at 138–39; J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 300–01 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967); Socony Mobil Oil Co. v. NLRB, 357 F.2d 662 (2d Cir. 1966); NLRB v. Park Edge Sheridan Meats, Inc., supra, 341 F.2d at 728; NLRB v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 355 & n.4 (2d Cir. 1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963); cf. NLRB v. Local 282, International Brotherhood of Teamsters, 412 F.2d 334, 336–38 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 682, 24 L.Ed.2d 682 (1970). In the former situation, when the employer's ostensible justification for the discharge is shown to have been pretextual, it is unnecessary to resort to any rule of causation, for the pretextual reason is ignored, and the only remaining reason for the discharge is the employer's anti-union animus. In the instant case, not even the General Counsel suggests that petitioner's justifications are pretextual. In the latter situation, where the employer was motivated by both valid and invalid reasons, a rule of causation is indispensable. A simple example will illustrate why this is so. If an employer discharges a union organizer in part because of organizational activities and in part because of repeated acts of industrial sabotage, it would be absurd to hold the discharge of that employee to be unlawful. The rule of causation applied in this Circuit is that "the General Counsel must at least provide a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so that it was partially motivated by an impermissible one." NLRB v. Park Edge Sheridan Meats, Inc., supra, 341 F.2d at 728; accord, NLRB v. Dorn's Transportation Co., supra, 405 F.2d at 712–13; NLRB v. Milco, Inc., supra, 388 F.2d at 138–39; NLRB v. L. E. Farrell Co., 360 F.2d 205, 208 (2d Cir. 1966). The magnitude of the impermissible ground is immaterial, compare NLRB v. Great Eastern Color Lithographic Corp., supra, 309 F.2d at 355 ("final straw"), with NLRB v. D'Armigene, Inc., 353 F.2d 406, 409 (2d Cir. 1965) ("significant part" of motivation for discharge), as long as it was the "but for" cause of the discharge, accord, Midwest Regional Joint Board v. NLRB, 183 U.S.App. D.C. 413, 419, 564 F.2d 434, 440 (1977); NLRB v. Klaue, 523 F.2d 410, 413 (9th Cir. 1975); NLRB v. Fibers International Corp., supra, 439 F.2d at 1312; NLRB v. Ayer Lar Sanitarium, 436 F.2d 45, 49–50 (9th Cir. 1970); Southwest Latex Corp. v. NLRB, 426 F.2d 50, 54–55 (5th Cir. 1970).

As the Supreme Court has explained in considering a discharge motivated in part by the exercise of First Amendment freedoms:

A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected con-

duct than he would have occupied had he done nothing. The difficulty with [such a rule] is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). It may be argued that a "but for" test is inadequate to protect the organizational rights of employees, but this argument fails for two reasons. First, it is doubtful whether a test which is adequate to protect First Amendment rights would prove inadequate to protect organizational rights. Second, and more important, it is not the purpose of the statute to pressure employees into undertaking organizational efforts. Embodied in the statute is a principle of free choice.[6] Without a "but for" test, we "could place an employee in a better position as a result of" his organizational efforts "than he would have occupied had he done nothing." *Id.* Such a result would actually undermine the purpose of the statute by inducing employers to tread especially lightly when a union activist is involved—thereby violating the Act by encouraging pro-union activity. *Cf. NLRB v. Milk Drivers & Dairy Employees, Local 38, supra,* 531 F.2d 1162. Thus, we hold that the Board was correct in applying a "but for" test in this case.

■ The issue before us, therefore, is whether there is substantial evidence in the record considered as a whole to support the Board's conclusion that Tabaka would not have been discharged but for his union activities. We hold that there is not.

In its decision, the Board explained its conclusion in the following manner:

> On the basis of entire [sic] record, we are convinced that had Tabaka not engaged in union activities he would have been retained at least until such time as he completed his assigned chores. Our

---

**6.** The statute itself makes it clear that Congress intended to accomplish its goals in two ways: (1) "by encouraging the practice and procedure of collective bargaining" and (2) "by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151 ("Findings and declaration of policy"). We have no qualms about acknowledging "the importance of union recognition in securing collective bargaining." *NLRB v. Pennsylvania Greyhound Lines, Inc.,* 303 U.S. 261, 267, 58 S.Ct. 571, 574, 82 L.Ed. 831 (1938). Nor do we doubt that "[t]he Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126 (1938). But Congress did not pass the Act to insure that workers would promote, organize, vote for, join or otherwise assist unions. Quite to the contrary, the purpose of the Act is to encourage the "practice and procedure" of collective bargaining once employees have freely chosen to bargain collectively. No matter how wise or foolish the decision to join or not join a union, that decision belongs to the individual worker, at least until a bargaining representative selected by a majority of the workers negotiates a union security agreement. It would be incongruous indeed for Congress to guarantee to employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" *and also* "the right to refrain from any or all of such activities," 29 U.S.C. § 157, and at the same time imply in its declaration of policy that workers are to be encouraged to do the former rather than the latter.

finding in this regard is based on Petruzzi's undenied statement that, if Tabaka had not engaged in union activities, he would have been retained. Indeed, in view of [Petitioner's] earlier decision to retain Tabaka after the pole survey was completed, it is reasonable to assume that, but for Tabaka's role as the leading union advocate, he would have been retained to perform other work at the Waterbury jobsite as well as at the yet-to-be constructed Plymouth and/or Middlebury jobsites which [Petitioner] was then contemplating. Thus, when Tabaka's discharge is viewed in light of [Petitioner's] change of attitude towards Tabaka, its direct threat to discharge him for his union activities, as well as its unlawful campaign to undermine the Union's majority, we can only conclude that said discharge was motivated by [Petitioner's] union animus. Moreover, by discharging the Union's leading adherent just 1 week before the election, [Petitioner] also sought to dissuade the employees from supporting the Union in the upcoming election. As is evident from the results of the election, [Petitioner] succeeded in its efforts. Accordingly, we find that Tabaka's discharge violated Section 8(a)(3) of the Act.

This reasoning will not withstand analysis.

First, the "assigned chores" to which the Board refers were nothing more than odd jobs, given to Tabaka to keep him occupied when his phone company counterpart, Sullivan, was unavailable. The number of unfinished chores was so small that it took no more than a few hours, over the course of several months, for other employees to complete them in their spare time. The notion that the petitioner, which had planned to get rid of this temporary employee back in July of 1975, and which had kept him on only to finish the final inspection, would have kept him on after January 9, 1976, when the final inspection was finished on January 6, and when its budget made no allowance for his wages, merely so that he could be allowed to wrap up a few hours of unfinished busy work that could be accomplished in the spare time of other employees, is absurd.

Second, the Board's translation of "Petruzzi's undenied statement" is a distortion of what was said. The most that this record will support is that Petruzzi asserted, in the course of an apparently heated argument, that he could have found (some witnesses said he said "created") more work for Tabaka, but as a result of the union situation, the matter was out of his hands. Petruzzi's statement was little more than a bald assertion that he could have found more work. In the entire course of this litigation, no one has ever suggested what that work might have been. Tabaka had no interest in a job as a salesman, and his back injury prevented him from working as an installer or repairman. The mere fact that Petruzzi said he could have created a new job does not make it so. Moreover, even if it were true that Petruzzi could have found something, there is nothing in this record to support the conclusion that he would again have been successful in persuading Baker to give the new-found work to Tabaka. The Board's theory in this regard rests on the assumption that because Baker did it once, it is "reasonable to assume" that he would do it again. This assumption reflects a fundamental misunderstanding of the nature of petitioner's business and of Tabaka's role in it. After Tabaka finished the pole survey, it made good, logical business sense to keep him on to finish the final inspection. Both the pole survey and the final inspection involved visual inspection, recording and map updating. Tabaka had been involved in the process of determining what should be done to each pole, and it was rational to keep him on to conduct an inspection to determine whether everything had been done correctly. There was also an economic motive to keep him on. The completion of the final inspection by the phone company was expected to result in a refund, and the whole idea behind keeping Tabaka on was to have him expedite the completion of the inspection. He performed this task so well that Sullivan complained about being rushed. The situation was completely different at the end of the final inspection.

The phone company work was finished, and further expediting was unnecessary. The process of inspection for error was also complete; indeed, the construction contractor's employees had all left. While it is true that there were a few loose ends to be tied up, it is beyond dispute that Petruzzi spent only a few hours over several months making sure the work was done properly. The only rational conclusion is that because Tabaka had a job that involved the final inspection of a construction project, his job would end when the construction ended and the inspection was complete. The Board's contrary finding is in truth based on the assumption that if Tabaka had not engaged in pro-union activities Petruzzi would have found, and petitioner would have given him, a sinecure. There is no basis in this record to support that assumption.

Third, the Board also relied on petitioner's "direct threat to discharge [Tabaka] for his union activities." This argument is circular. The only "threat" was Petruzzi's remark that he might have been able to find more work for Tabaka. ALJ Blackburn found that this was a threat sufficient to support a conclusion that § 8(a)(1) had been violated. Inasmuch as the statement itself proves little regarding petitioner's motives for discharging Tabaka, no additional force is added to the Board's reasoning merely by denominating the statement a "threat." Equally unwarranted by the record is the Board's characterization of petitioner's conduct as an "unlawful campaign to undermine the Union's majority." In reality, Petruzzi appears to have committed violations of the Act while arguing the pros and cons of joining a union. But those arguments took place at a time when there was doubt whether he himself was a member of the bargaining unit, and his conduct can hardly be described as a campaign to undermine the union.

Finally, while the Board may have been justified in drawing an inference of anti-union animus on the basis of the timing of Tabaka's discharge, *NLRB v. M. H. Brown*

*Co., supra,* 441 F.2d at 843; *NLRB v. United Mineral & Chemical Corp.,* 391 F.2d 829, 832–35 (2d Cir. 1968); *NLRB v. Montgomery Ward & Co.,* 242 F.2d 497, 502 (2d Cir.), cert. denied, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957), it was not justified in completely ignoring the innocent motivations for the timing of the discharge. Petitioner had relatively little control over when the final inspection would be complete. In November of 1975, Baker said he thought it would be done sometime after the first of the year, not later than February. Tabaka had greater control over the timing, for he was doing the inspection. Tabaka and Sullivan announced the completion of the inspection roughly on schedule on January 6. The next payday was Friday, January 9. Inasmuch as the task for which Tabaka's job was extended had ended, Friday was the logical day for his discharge.

Based on this record, we can reach but one conclusion. Tabaka would have been discharged on January 9, 1976, regardless of his union activities. Put in the language of prior decisions, the General Counsel has not provided "a reasonable basis for inferring that the permissible ground alone would not have led to the discharge." *NLRB v. Park Edge Sheridan Meats, Inc., supra,* 341 F.2d at 728. In view of this conclusion, the bargaining order cannot stand.[7]

The petition for review is granted; the order of the Board is modified by vacating paragraphs 1(d), 1(e), 1(f), 2(a), 2(b), 2(c), and 2(d) thereof and by appropriately modifying any notice which must be posted; the cross-application for enforcement is granted except to the extent just indicated.

FEINBERG, Circuit Judge (dissenting):

I dissent from the majority's reversal of the Board's decision that the Company's discharge of Tabaka violated § 8(a)(3) of the National Labor Relations Act and from the refusal to enforce those portions of the Board's order requiring appropriate relief for that violation. I also dissent from the

---

7. The Board remains free to order the new election originally recommended by ALJ Blackburn.

**102**

majority's refusal to enforce the Board's bargaining order.

The majority describes the controlling question as "whether there is substantial evidence in the record considered as a whole to support the Board's conclusion that Tabaka would not have been discharged but for his union activities." The recent cases in this circuit, unlike those from other circuits cited in Judge Meskill's thorough opinion, have not usually framed the issue in "but for" terms when the employer has both valid and invalid reasons for discharge.[1] However, I see no need for an extended discussion of problems I have with the "but for" test, because the majority's result cannot be justified even under its own test.

The record reveals evidence of the following: Tabaka led the attempt to organize the employees in the unit, and the Company concedes that it knew of Tabaka's union activities when it discharged him. The Company was hostile to the union and engaged in a course of unlawful conduct designed to undermine it. Among other things, the Company gave various employees the impression their union activities were under surveillance and threatened them with loss of benefits and more onerous working conditions in reprisal for their union activities. These activities were the basis of the § 8(a)(1) order, which the Company does not contest and which the majority confirms by enforcing. Commission of these unfair labor practices is probative of the Company's anti-union motivation in discharging Tabaka, see, e. g., *NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 465 (2d Cir. 1973), as the Board noted. Tabaka was told by his immediate superior, Petruzzi, that if Tabaka had not engaged in union activities, more work could have been found to keep him employed. Indeed, Petruzzi had once before been able to find

work for Tabaka to keep him on the job. Tabaka was the first unit employee and had been employed for over 15 months without any criticism of his work. Nevertheless, the Company discharged him without advance notice one week before the hotly contested scheduled election. Yet, some four months before, when Tabaka had asked Petruzzi for a raise (before the union came on the scene), Petruzzi told Tabaka to "approach him [again] in four or five months." Tabaka testified that he had twice been told that the Company had a "couple of years" of work for him, and Tabaka and Sullivan testified that after the Union appeared, they were rushed to finish their work. Other evidence indicates that when Tabaka was fired, there were still several more weeks of work for him to do.

This record, then, supports findings that the Company was hostile to Tabaka's union activities before it discharged him, indeed admitted that Tabaka would be laid off because of his involvement with the union, accelerated the completion of his final inspection duties, and then summarily terminated him without advance notice shortly before the representation election, despite the fact that he had some work left to do. Substantial evidence therefore supports the Board's conclusion that when the Company discharged "the Union's leading adherent" it was "motivated by . . . union animus" and an intent "to dissuade the [remaining] employees from supporting the Union in the upcoming election."

Using the majority's test, I therefore conclude that there was substantial evidence in the record considered as a whole to support the Board's conclusion that Tabaka would not have been discharged on January 9, 1976, but for his union activities. In refuting the Board's findings, the majority has improperly substituted its judgment for the Board's as to the inferences to be drawn

---

1. E. g., in *NLRB v. George J. Roberts & Sons, Inc.,* 451 F.2d 941, 945 (2d Cir. 1971), we said in an analogous situation: "Even if there were ample grounds to fire Moller, [a union leader] . . . if his discharge was even partially motivated by his union activity, there is a violation of § 8(a)(3)." See also *NLRB v. Gladding Keystone Corp.,* 435 F.2d 129, 131–32 (2d Cir. 1970); *J. P. Stevens & Co. v. NLRB,* 380 F.2d 292, 300–01 (2d Cir.), *cert. denied,* 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). The majority opinion cites all three of these cases with approval. For agreement in other circuits with this phrasing of the test, see, e. g., *Allen v. NLRB,* 183 U.S.App.D.C. 83, 89, 561 F.2d 976, 982 (1977); *NLRB v. Big Three Industries, Inc.,* 497 F.2d 43, 49 (5th Cir. 1974).

from the evidence in the record. See *NLRB v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1165 (2d Cir. 1976), a case cited with approval by the majority.

In the last sentence of the decision, the majority vacates without discussion the portions of the Board's order that required the Company to recognize and bargain with the union. I assume the reason for this action is that in the absence of a § 8(a)(3) violation, the majority concluded the Company's conduct did not warrant a bargaining order. On this record, I would disagree with this conclusion,[2] but since I think the Board correctly found that Tabaka's discharge violated § 8(a)(3), a fortiori, I think the bargaining order was appropriate.

Accordingly, I dissent.

**2.** Where, as here, there is a showing that the union once had authorization cards from a majority of the employees in the unit, a bargaining order is proper even though the employer's violations were less than "outrageous" or "pervasive" if the Board properly concludes that the practices had "the tendency to undermine majority strength and impede the election process." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 613–14, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). And in *NLRB v. International Metal Specialities, Inc.,* 433 F.2d 870, 872 (2d Cir. 1970), *cert. denied,* 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971), we held that under *Gis-* sel the Board has "almost total discretion to determine when a bargaining order is appropriate." It has been recognized that when violations of the type found in this case—"[t]hreatening employees with discharge, loss of benefits, or more onerous working conditions for engaging in union activity,"—occur in a small closely-knit unit, the impact is overwhelming and a fair re-run election is unlikely. E. g., *NLRB v. Scoler's Inc.,* 466 F.2d 1289, 1293 (2d Cir. 1972). Thus even disregarding Tabaka's discharge, the reasons given by the Board for imposition of the bargaining order in this case adequately explain and justify its decision.